**[J-8A-2025, J-8B-2025 and J-8C-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 38 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 788 EDA |
| | : | 2022 entered on November 30, |
| v. | : | 2023, affirming the Judgment of |
| | : | Sentence of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| DERRICK WALKER, | : | 51-CR-0006112-2019 entered on |
| | : | March 1, 2022. |
| Appellant | : | |
| | : | ARGUED:  March 5, 2025 |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 39 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 790 EDA |
| | : | 2022 entered on November 30, |
| v. | : | 2023, affirming the Judgment of |
| | : | Sentence of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| DERRICK WALKER, | : | 51-CR-0006114-2019 entered on |
| | : | March 1, 2022. |
| Appellant | : | |
| | : | ARGUED:  March 5, 2025 |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 40 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 789 EDA |
| | : | 2022 entered on November 30, |
| v. | : | 2023, affirming the Judgment of |
| | : | Sentence of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| DERRICK WALKER, | : | 51-CR-0006113-2019 entered on |
| | : | March 1, 2022. |
| Appellant | : | |
| | : | ARGUED:  March 5, 2025 |

*Justice McCaffery delivers the Opinion of the Court with respect to Parts I, II, III(A)-(B), and III(C)(iv), except for footnote 19, and announces the judgment of the Court. The Opinion is joined in full by Justices Donohue and Wecht. Justice Dougherty joins Part III(C)(i) to the extent it abrogates the logical connection test.*

## OPINION

**JUSTICE McCAFFERY**                    **DECIDED: January 28, 2026**

In this discretionary appeal, we consider two questions which commonly arise in criminal prosecutions. The first question concerns the consolidation of separate offenses — here, three rapes of three different women on three different occasions — for a joint jury trial. Although the consolidation of separate offenses is patently prejudicial to a defendant, pursuant to Pennsylvania Rule of Criminal Procedure 582, separate offenses may be tried together if, *inter alia*, "the evidence of each of the offenses would be admissible in a separate trial for the other[.]" Pa.R.Crim.P. 582(A)(1)(a). In order to determine this preliminary question, we examine Pennsylvania Rule of Evidence 404(b), and, specifically, the parameters of the "common plan, scheme and design" (CPSD) exception to the general rule precluding the admission of propensity evidence.

The second question concerns the admissibility of out of court statements in a forensic report — here, rape kit reports — absent testimony from the author of said report. We scrutinize whether admission of such reports violates a defendant's constitutional right to confront witnesses against him, and whether they are otherwise admissible under our exceptions to the hearsay rule.

Because we conclude Appellant, Derrick Walker, is entitled to a new trial on both claims, we vacate the judgment of sentence and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

In July of 2019, Walker was arrested and charged with the rape of three different victims on three separate occasions — P.C., in January of 2011; T.A., in December of 2014; and B.H., in January of 2015. Each victim underwent a sexual assault examination after the attack, and, in each case, DNA from the purported perpetrator was recovered and uploaded to the Combined DNA Index System (CODIS).[1] In December of 2018, a CODIS search uncovered that the DNA samples taken from the three victims matched — thus, police believed the victims were assaulted by the same perpetrator. That DNA profile later was linked to Walker.

The relevant facts underlying each assault are as follows.

CP-51-CR-0006112-2019 (Docket No. 6112): On January 20, 2011, around midnight, P.C. left her home in the Oxford Circle neighborhood in Philadelphia to walk to a nearby 7-11 convenience store to purchase cigarettes. She was outside the store when Walker, whom she did not know, approached, "flashed money at [her,] and said 'you know

---

[1] The FBI website describes CODIS as a tool that

> blends forensic science and computer technology [to] enable[] federal, state, and local forensic laboratories to exchange and compare DNA profiles electronically, thereby linking serial violent crimes to each other and to known offenders. …
> CODIS generates investigative leads in cases where biological evidence is recovered from the crime scene. Matches made among profiles in the Forensic Index can link crime scenes together, possibly identifying serial offenders. Based upon a match, police from multiple jurisdictions can coordinate their respective investigations and share the leads they developed independently. Matches made between the Forensic and Offender Indexes provide investigators with the identity of suspected perpetrators. Since names and other personally identifiable information are not stored at [the National DNA Index System], qualified DNA analysts in the laboratories sharing matching profiles contact each other to confirm the candidate match.

https://le.fbi.gov/science-and-lab/biometrics -and-fingerprints/codis-2.

what to do for this.'" N.T., 10/28/2021, at 50. Although P.C. testified that she was not a prostitute and that she "had a bad feeling[,]" she followed Walker to the alley behind the 7-11; P.C. claimed she did so because she was scared. *Id.* at 13, 52. Once isolated, Walker pushed P.C. to her knees and tried to force her to perform oral sex on him. When she resisted, he punched her in the face and threw her body against a car that was parked in the alley. Walker then forcibly pulled down P.C.'s pants and raped her. Afterwards, P.C. pulled up her pants and followed him back to the front of the store. When Walker told her he was going to get money to pay her, P.C. stated she was not a prostitute. He then walked away, and P.C. ran home. She testified that she took off her clothes and cried for hours until her husband woke up and called the police. P.C. went to the hospital the next morning and underwent a sexual assault examination. The nurse examiner prepared a rape kit report. Sperm recovered from a vulva swab resulted in a male DNA profile that did not match any existing profiles in the database.

CP-51-CR-0006113-2019 (Docket No. 6113): On the morning of December 2, 2014, T.A., a recovering drug addict, attended a methadone program near 7th Street and Girard Avenue in Philadelphia. After leaving the program around 11:00 a.m., she headed to a nearby doughnut shop where she would often meet with friends. When she arrived, Walker, whom she did not know, was standing outside. He inquired whether she was interested in purchasing headphones. When T.A. expressed interest, Walker asked her to walk up Girard Avenue with him because he also "had drugs on" him and did not want to exchange anything on the street. N.T., 10/27/2021, at 55. As they walked, Walker put his arm around T.A. She was not alarmed by this because of her prior experience purchasing drugs — sellers would often put their arms around buyers to give the appearance of familiarity. However, T.A. then felt a knife at the base of her neck. Walker

calmly told her, "you're going to do what I'm telling you to do" and "[w]e're going to keep walking." *Id.* at 59.

Walker led T.A. across Girard Avenue towards an alley. As he did so, he took her money and cell phone. When they reached the alley, Walker pushed T.A. to the ground and forced her to perform oral sex on him. He then grabbed her face, turned her around, and pushed T.A. against a fence before raping her. Next, Walker instructed T.A. to walk in the opposite direction from him; he did not return her phone or money. T.A. ran to a store a few blocks away, where she immediately called her boyfriend and the police. She underwent a sexual assault examination at the Philadelphia Sexual Assault Response Center (PSARC). The nurse examiner prepared a rape kit report. Sperm recovered from a perianal swab resulted in a male DNA profile that did not match any existing profiles in the database.

CP-51-CR-0006114-2019 (Docket No. 6114): B.H. recently moved to Philadelphia and was living in the area of 55th and Thompson Streets. At approximately 11:30 a.m. on January 12, 2015, as she was exploring the neighborhood, she asked a woman where she could buy loose cigarettes (commonly known as "loosies"). As she attempted to follow the woman's directions, she ran into Walker, whom she had never met. B.H. then asked him where she could purchase "loosies." Walker responded that he sold them, but did not have any on him at that time. He told her to follow him, which she did. Walker led B.H. to the rear of a nearby house. B.H. handed Walker some money, and he then entered the property. While she waited for him, B.H. made a phone call. After the call ended, she "felt someone come behind [her], put their hand over [her] mouth, and trip [her] forward onto the ground [and] on [her] stomach." N.T., 10/28/2021, at 88. When her attacker attempted to pull down her pants, she screamed; he then struck her in the back with a tire iron. The attacker was able to remove her pants and forcibly rape B.H.

while she begged him to stop. The attacker then fled. B.H. ran home and immediately called the police, who were able to recover the tire iron. B.H. underwent a sexual assault examination at PSARC, and the nurse examiner prepared a rape kit report. Sperm recovered from a perianal swab resulted in a male DNA profile that did not match any existing profiles in the database.

As noted above, it was not until December 2018 that law enforcement learned that the unknown male DNA samples recovered from all three victims matched. In July 2019, after the unknown male DNA profile was linked to Walker, Walker was arrested and charged, at separate dockets, for each case.[2] Retesting confirmed that Walker was the source of the DNA recovered from each victim during the sexual assault examinations.

On November 20, 2019, the Commonwealth moved to consolidate the cases for trial pursuant to Pennsylvania's joinder rule, Rule 582.[3] Relying upon the exceptions to the admission of other bad acts evidence in Rule 404(b), the Commonwealth argued that

---

[2] At Docket No. 6112, Walker was charged with two counts each of rape and involuntary deviate sexual intercourse (IDSI), and one count each of unlawful restraint, sexual assault, false imprisonment, indecent exposure, and simple assault for the January 2011 attack of P.C. *See* 18 Pa.C.S. §§ 3121(a)(1)-(2), 3123(a)(1)-(2), 2902(a)(1), 3124.1, 2903(a), 3127(a), and 2701(a), respectively. He was charged, at Docket No. 6113, for the December 2014 assault of T.A. with two counts each of rape, IDSI, and kidnapping, three counts of robbery, and one count each of unlawful restraint, sexual assault, false imprisonment, theft by unlawful taking, receiving stolen property, possession of an instrument of crime (PIC), indecent exposure, terroristic threats, simple assault, and recklessly endangering another person (REAP). *See* 18 Pa.C.S. §§ 3121(a)(1)-(2), 3123(a)(1)-(2), 2901(a)(2)-(3), 3701(a)(1)(i)-(iii), 2902(a)(1), 3124.1, 2903(a), 3921(a), 3925(a), 907(a), 3127(a), 2706(a)(1), 2701(a), and 2705, respectively. For the January 2016 assault of B.H., Walker was charged with two counts of rape, and one count each of unlawful restraint, sexual assault, false imprisonment, PIC, indecent exposure, terroristic threats, simple assault, and REAP at Docket No. 6114. *See* 18 Pa.C.S. §§ 3121(a)(1)-(2), 2902(a)(1), 3124.1, 2903(a), 907(a), 3127(a), 2706(a)(1), 2701(a), and 2705, respectively.

[3] Rule 582 permits the joinder of offenses charged in separate informations if, *inter alia*, "the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion." Pa.R.Crim.P. 582(A)(1)(a).

the evidence of each assault would be admissible in a trial for the others because the assaults shared sufficient similarities to establish a common plan, scheme, or design, and they demonstrated an absence of mistake, that is, they rebutted any claim by Walker that the acts were consensual. Despite Walker's objection to consolidation, the trial court granted the Commonwealth's motion following a hearing in December 2019.

Prior to trial, Walker filed a motion *in limine* seeking to preclude the Commonwealth from introducing the PSARC rape kit reports for T.A. and B.H.[4] The Commonwealth had informed him that the nurses who performed the sexual assault examinations of those victims were no longer employed by PSARC, and it intended to introduce the reports through the testimony of PSARC's nurse manager and clinical director, Allison Denman. Walker insisted that admission of the reports through Denman's testimony would violate the Confrontation Clause under both the state and federal constitutions, as well as the rule against hearsay. The trial court heard argument on the motion the first day of trial. When the court asked Walker's counsel if there was an objection "over and above the introduction of the report[s] to facilitate [how] the rape kit[s] … [were] conducted and the result and transfer of chain of custody[,]" counsel responded, "Yes, … that is my objection." N.T., 10/27/2021, at 14. Although the court denied Walker's motion, it commented that it "want[ed] to see the reports themselves [prior to their admission] just to make sure that there [were] no testimonial type of portions therein that [could not] be introduced over and above the rape kit itself[.]" *Id.* at 15.

As the jury trial continued, the Commonwealth presented testimony from the three victims, the investigating police detectives, PSARC clinical director Denman, and a DNA

---

[4] Notably, Walker did not file a motion to exclude the admission of P.C.'s rape kit report, which was included in her medical records. *See* Commonwealth's Exhibit 24. In fact, Walker stipulated to the admission of P.C.'s medical records, agreeing they were "taken in the regular course of business and they are certified medical records." N.T. 10/29/2021, at 31. The sexual assault nurse examiner who prepared P.C.'s rape kit report did not testify at trial.

expert. Walker did not testify or call any witnesses. His defense was that each of the victims was engaging in prostitution and, therefore, the sexual encounters were consensual. At the conclusion of trial, the jury found Walker guilty of rape, IDSI, and sexual assault at Docket Nos. 6112 and 6113 (victims P.C. and T.A.), and rape, sexual assault, and PIC at Docket No. 6114 (victim B.H.).[5] On March 1, 2022, the trial court imposed an aggregate sentence of 28 to 56 years' imprisonment and required Walker to register for life as a Tier III sexual offender pursuant to the Sexual Offenders' Registration and Notification Act (SORNA).[6] *See* 42 Pa.C.S. §§ 9799.14(d)(1), (4) (designating rape and IDSI as Tier III offenses); 9799.15(a)(3) (requiring Tier III offenders to register for life). Walker filed a timely direct appeal at each docket, and the Superior Court consolidated the appeals *sua sponte*.

Walker raised two issues on appeal: (1) whether the trial court abused its discretion when it consolidated the separate cases for trial, and (2) whether the trial court's admission of the rape kit reports, absent testimony from the nurse examiners, violated his right to confrontation under both the federal and state constitutions, or amounted to inadmissible hearsay.

In its Pa.R.A.P. 1925(a) opinion, the trial court defended its decision to consolidate the cases under the common, plan, scheme, and design exception to the rule prohibiting propensity evidence. *See* Trial Court Opinion at 8-9; *see also* Pa.R.E. 404(b). The court found the facts of each case were "strikingly similar" and Walker's "*modus operandi* corroborated the DNA matches" as well as the identity of Walker. Trial Court Opinion at 9, 13. The trial court also opined that "joinder of the three similarly patterned cases" was

---

[5] The jury found Walker not guilty of PIC at Docket No. 6113, and the Commonwealth *nolle prossed* the remaining charges.

[6] The Commonwealth waived an assessment of Walker as a sexually violent predator under SORNA. *See* 42 Pa.C.S. §9799.24.

appropriate to counter Walker's defense of consent. *Id.* at 10. Further, the court concluded Walker was not prejudiced by the consolidation as the jury was capable of separating the evidence of each offense.

With regard to the admission of the rape kit reports, the trial court found no violation of the Confrontation Clause, under either the Sixth Amendment or Article I, Section 9, because it determined the reports were not testimonial — "[w]hile part of [the] examination was the collection of evidence, the primary goal … remained medical treatment of the patient." *See* Trial Court Opinion at 27-28 (explaining statements are testimonial when they "were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial") (citation omitted). The court did not address Walker's hearsay argument.

The Superior Court rejected both of Walker's claims in a unanimous, unpublished decision. *See Commonwealth v. Walker*, 309 A.3d 1082 (Pa. Super. 2023) (unpub. memo.).

First, the Superior Court found no abuse of discretion in the trial court's decision to consolidate the cases for trial. Pertinently, the panel agreed with the trial court's determination that the evidence of each sexual assault would be admissible in a trial for the others under the common plan, scheme, and design exception to the general preclusion of other bad acts testimony. *See id.* at *6. It described the similarities between the cases as "striking," concluding Walker's "pattern of assaults and the types of victims he chose" possessed a "[s]ufficient commonality" to refute any assertion that they were "merely coincidental[,]" but rather, supported a conclusion that the crimes were "so logically connected[,] they share a perpetrator." *Id.* (citation omitted). The Superior Court also determined the evidence was capable of separation by the jury — as the assaults were against different victims and occurred on different dates in different locations — and

that Walker did not demonstrate he was "unduly prejudiced by the consolidation." *Id.* Furthermore, in weighing the probative value of the evidence against its prejudicial effect, the Court highlighted that evidence of the other assaults was necessary to bolster the victims' otherwise uncorroborated testimony regarding lack of consent. *See id.*

Second, the Superior Court concluded the trial court did not abuse its discretion when it permitted the Commonwealth to introduce the rape kit reports for two of the victims absent testimony from the nurses who prepared the reports. The panel agreed with the trial court that, because the reports were not testimonial, Walker's Confrontation Clause rights were not violated. The Court agreed that the "primary purpose" of the reports was to "render medical assistance and aid to the victims of sexual assaults[,]" and not to establish past events in anticipation of a criminal prosecution. *Walker*, 309 A.3d at *8. Further, with regard to Walker's hearsay challenge, the Superior Court concluded the reports were admissible under either the medical record exception or the business records exception to the rule against hearsay. *See id.* at *8-*9 (*citing* Pa.R.E. 803(4) (records which describe medical history, symptoms, or cause and are "reasonably pertinent to [medical] treatment, or diagnosis"); 803(6) (records made at or near the time of occurrence by person with knowledge and kept "in the course of a regularly conducted" business activity). Accordingly, the Court affirmed Walker's judgments of sentence.

## II. ISSUES

Walker petitioned this Court for allowance of appeal, which we granted on the following claims:

> (1) Where this Court has previously split on the issue, what test should be employed in determining when 'other act' evidence satisfies the 'common plan' exception under Pa.R.E. 404(b); and under any of the possible tests approved by this Court, did the lower courts err by applying such a diluted standard that they improperly admitted prohibited propensity evidence under the guise of 'common plan'?

(2) Is the admission of a rape kit report by a forensic nurse after a forensic examination without any testimony by that nurse a violation of the Confrontation Clause and inadmissible hearsay?

*Commonwealth v. Walker*, 317 A.3d 524, 525 (Pa. 2024).

## III.  CONSOLIDATION

### A. Consolidation and Other Bad Acts Evidence

While Walker's first issue focuses on Pennsylvania Rule of Evidence 404(b), it is important to remember that, at bottom, the question before us concerns the consolidation of three separately charged cases for a single trial.  Thus, we begin with Pennsylvania Rules of Criminal Procedure 582 and 583, which govern the joinder and severance of offenses for trial.  The decision to consolidate offenses in a single trial is within the trial court's sole discretion, which we will not reverse absent a determination that there was a clear injustice to the defendant or a manifest abuse of discretion.  *See Commonwealth v. Cousar*, 928 A.2d 1025, 1037 (Pa. 2007).

Rule 582 permits offenses charged in separate informations to be consolidated for trial if "the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion[.]" Pa.R.Crim.P. 582(A)(1)(a).[7]  The corresponding severance rule, Rule 583, authorizes a court to sever offenses (or defendants) for trial "if it appears that any party may be prejudiced by offenses or defendants being tried together."  Pa.R.Crim.P. 583.  With these rules in mind, this Court crafted the following test to determine whether joinder or severance of separately-charged offenses is proper: (1) "whether the evidence of each of the offenses would be admissible in a separate trial for the other;" (2) "whether such

---

[7] Rule 582 also permits the joinder of separate cases for trial if the "offenses charged are based on the same act or transaction."  Pa.R.Crim.P. 582(A)(1)(b).  That part of the Rule is not implicated here.

evidence is capable of separation by the jury so as to avoid danger of confusion; and," (3) "if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses." *Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa. 1988). Thus, it is in this context — the first prong of the consolidation test — that we turn to Pennsylvania Rule of Evidence 404(b).

Rooted in common law,[8] Rule 404(b) precludes the admission of evidence of a person's other bad acts (including other crimes) for the purpose of demonstrating the person's bad character — in other words, the Commonwealth cannot present evidence of a defendant's other bad acts solely for the purpose of establishing the defendant's propensity to commit crimes (*i.e.*, because he did it once, he probably did it again). *See* Pa.R.E. 404(b)(1). However, subsection (b)(2) clarifies that other bad acts evidence may be admissible if it is offered for another (legitimate) purpose. *See* Pa.R.E. 404(b)(2). Rule 404(b)(2) includes a non-exclusive list of other purposes, permitting other bad acts evidence when it tends to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* In a criminal case, regardless of the proffered exception, other bad acts evidence is admissible "only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).[9]

---

[8] The Pennsylvania Rules of Evidence were adopted in 1998. Pennsylvania Rule of Evidence 404(b) tracks the language of the corresponding federal rule. *See* Fed. R. Evid. 404(b).

[9] This additional requirement — directing the trial court to weigh the relative probative and prejudicial value of the proposed evidence — is not included in the federal rules. *See* Fed. Rule Evid. 404(b)(2). Moreover, the federal rules **explicitly permit** a trial court to admit evidence of "any other sexual assault[s]" committed by the defendant when he is on trial for a sexual assault offense. Fed. Rule Evid. 413(a). Pennsylvania has not adopted Federal Rule 413(a).

The matter before us concerns another judicially-recognized exception to Rule 404(b) — when the other bad acts evidence demonstrates a defendant's common plan, scheme or design.[10]  The genesis of this evidentiary exception can be traced back to our nineteenth century decision in *Shaffner v. Commonwealth*, 72 Pa. 60 (1872).  The facts in *Shaffner* read like a B-movie.  Shaffner was on trial for poisoning his wife, Nancy.  The trial court permitted the Commonwealth to introduce evidence that Shaffner also poisoned John Sharlock a few months earlier.  Sharlock exhibited similar symptoms to Nancy before his death, which occurred at Shaffner's home.  According to the Commonwealth, the connection between the two deaths supplied the motive — Shaffner was having an affair with Sharlock's wife, and upon the deaths of their respective spouses, they each collected life insurance proceeds.

Considering Shaffner's challenge to the admission of his (purported) role in Sharlock's death during his trial for the murder of Nancy, this Court opined:

> To make one criminal act evidence of another, **a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or** it must be necessary to identify the person of the actor, by **a connection which shows that he who committed the one must have done the other.**  Without this obvious connection, it is not only unjust to the prisoner to compel him to acquit himself of two offences instead of one, but it is detrimental to justice to burthen a trial with multiplied issues that tend to confuse and mislead the jury.  The most guilty criminal may be innocent of other offences charged against him, of which, if fairly tried, he might acquit himself.  From the nature and prejudicial character of such evidence, it is obvious it should not be received, unless the mind plainly perceives that the commission of the one tends, by a visible connection, to prove the commission of the other by the prisoner.

---

[10] Rule 404(b), itself, is an exception to the general rule that all relevant evidence is admissible.  *See Commonwealth v. Dillon*, 925 A.2d 131, 136 (Pa. 2007).  Rule 401 defines evidence as relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Pa.R.E. 401(a)-(b).  Like the decision to consolidate or sever cases for trial, we review evidentiary rulings for an abuse of discretion.  *Commonwealth v. Yale*, 249 A.3d 1001, 1007 (Pa. 2021).

*Shaffner*, 72 Pa. at 65 (emphases added).

Turning to the matter before it, the *Shaffner* Court emphasized that in order to introduce evidence of Sharlock's murder during the trial for Nancy's murder, both crimes "must have been … contemplated by [Shaffner] as **parts of one plan** in his mind[;]" that is, Shaffner must have "contemplated the death of Nancy **before** taking the life of Sharlock." *Shaffner*, 72 Pa. at 66 (emphases added). It was of this amorphous preconceived plan that the Court found no supporting evidence in the record. Additionally, the Court determined there was no evidence that Shaffner intended to marry Sharlock's wife, which would have made it "probable, that [he] took Sharlock's life as preparatory to taking Nancy's life, and as the means of enabling him to marry" Sharlock's wife. *Id.* In fact, the two had been having an affair for years, even prior to their marriages to their respective spouses. The lack of testimony indicating Shaffner intended to marry Sharlock's wife also undermined any intimation that Shaffner killed Sharlock before Nancy so that Sharlock's wife (assuming he intended to marry her) would obtain Sharlock's life insurance proceeds. *See id.* at 67. Accordingly, the *Shaffner* Court held the trial court abused its discretion when it permitted evidence of Sharlock's murder during Shaffner's trial for Nancy's murder: "[I]t was … unjust to [Shaffner] to compel him, on his trial for the murder of his wife, to defend himself against the charge of murdering Sharlock." *Id.* at 68.

Thus, what evolved from Shaffner was a two-fold test to determine the admissibility of (arguable propensity) evidence pursuant to the common plan, scheme or design exception — other bad acts evidence was admissible if it demonstrated (1) a previously conceived plan that linked the prior crime and present crime together for a singular purpose or (2) crimes so similar that they must have been committed by the same actor. *See also Commonwealth v. Yale*, 249 A.3d 1001, 1015 (Pa. 2021) ("[T]his Court has

consistently required that evidence of a defendant's bad acts submit to two principles derived from *Shaffner* and embedded in our decisional law: Bad act evidence is admissible 1) if a logical connection exists between the bad act(s) and the crime charged, linking them for a purpose the defendant intended to accomplish, or 2) if the bad acts manifest a signature crime.") (citation omitted).

The first *Shaffner* exception has been referred to by legal scholars as the "linked acts" theory. *See* Edward J. Imwinkelried, *Using a Contextual Construction to Resolve the Dispute Over the Meaning of the Term "Plan" in Federal Rule of Evidence 404(B)*, 43 U. KAN. L. REV. 1005, 1014 (August 1995). Evidence of other crimes or bad acts is admissible if the prosecutor establishes that the defendant formed "a single, overall grand design" and that each bad act or crime is an "integral component[] of the same plan; each criminal act is a stop or stage in the execution of the plan." *Id.* at 1014-1015. Thus, the key to the "linked plan" exception is one overarching goal.

The second *Shaffner* exception is commonly known as the defendant's *modus operandi* — "a pattern of criminal behavior so distinctive that investigators attribute it to the work of the same person." Black's Law Dictionary (12th Ed. 2024) ("MODUS OPERANDI").

Although the *Shaffner* Court purported to limit the common plan, scheme or design exception to bad acts committed for the purpose of an overarching common goal, or signature crimes, over the years, this Court has relaxed the strict parameters surrounding the exception. In *Commonwealth v. Wable*, 114 A.2d 334 (Pa. 1955), we described the common plan, scheme or design exception as permitting evidence of a defendant's other bad acts when "there is such a **logical connection** between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other." *Id.* at 336-337 (emphasis added). In that case, Wable was on trial for the murder of a truck

driver, who was sleeping in the cab of his truck along the Pennsylvania Turnpike. *Id.* at 335-336. The Commonwealth introduced evidence that, three days before the crime, Wable murdered another truck driver sleeping in his truck parked on the Pennsylvania Turnpike, and three days after the crime, he shot (but did not kill) a third truck driver who was sleeping in his cab on an Ohio highway, near the Pennsylvania Turnpike; the third victim identified Wable as his assailant. *See id.* In determining the evidence of the other shootings was admissible at Wable's trial for the first shooting, the Court highlighted that Wable's gun was used in all three crimes, Wable admitted he was present during all three shootings (although he claimed another man shot the victims), and "there was an almost uncanny similarity in all the details of their perpetration[.]" *Id.* at 337. Without expressly invoking the *modus operandi* exception, the Court summarized that "it would be difficult to conceive of a clearer example of crimes committed in the course of a common scheme, plan, or design." *Id.*

Since *Wable*, *Shaffner*'s two-pronged common plan, scheme, or design exception morphed into a more general consideration as to whether the defendant's other bad acts share "sufficient similarities" with the offense on trial. In fact, a new test to determine "similarity" arose following *Wable* — courts were to consider "the elapsed time between the crimes, the geographical proximity of the crime scenes, and the manner in which the crimes were committed." *Commonwealth v. Rush*, 646 A.2d 557, 561 (Pa. 1994) (citation omitted). In *Rush,* this Court determined that the trial court properly admitted evidence of the defendant's nearly decade-old conviction of robbery and assault at his murder trial when "there [were] **sufficient similarities** to warrant the conclusion that one individual committed both crimes." *Id.* (emphasis added). Despite the time lapse between the prior and present offenses, the *Rush* Court emphasized that the defendant was incarcerated for most of the relevant period, both crimes occurred in "a similar geographic location[,]"

and the crimes were committed in similar manner — in both instances, the defendant lived in the same building as the victims (both young, black females) and gained entry into their apartments without force, he restrained and stabbed the victims repeatedly with knives from their own homes, he ransacked the apartments but stole only small valuables, and before leaving, he cleaned the murder weapons. *Id. See Commonwealth v. Miller*, 664 A.2d 1310, 1318 (Pa. 1995) (evidence of rape and attempted murder of third woman admissible at trial for rape and murder of two victims under common plan, scheme and design exception; facts of the cases established that, over a five-year period, defendant had a "common design in luring similar type victims into his vehicle, taking them to remote areas for sexual purposes against their will and brutally beating them in a similar manner").

While the aforementioned cases involved a trial court's decision to admit other bad acts testimony, this Court applied the same analysis when reviewing a court's decision to consolidate cases for trial. *See Commonwealth v. Clayton*, 532 A.2d 385, 393 (Pa. 1987) (similarities between murders of two drug dealers revealed a common scheme and defendant's identity sufficient to consolidate cases for trial; defendant confessed to both murders as way to increase his influence in local drug trade, murders occurred three months apart, and both victims were shot execution-style above bars with similar if not the same weapon); *Commonwealth v. Keaton*, 729 A.2d 529, 537 (Pa. 1999) (consolidation of murder case with two separate rape cases was proper as the cases shared "similarities in the details of each crime[;]" victims were all black female, crack cocaine addicts, who were acquainted with the defendant, the offenses all occurred at night within a six-month period, and the defendant forced the victims into an abandoned house in his neighborhood where he engaged in either bondage or strangulation, and raped each victim*); Commonwealth v. Newman*, 598 A.2d 275, 278-279 (Pa. 1991)

(consolidation of two rapes was proper as they demonstrated a "common design[;]" both rapes occurred late at night in x-ray department at hospital when the defendant was the only technician, both victims were females who suffered from a head injury, and both rapes began with the defendant "kissing and hugging the victim and fondling their breasts" before climbing on the exam table to rape them); *Commonwealth v. Robinson*, 864 A.2d 460, 481-483 (Pa. 2004) (trial court did not err in denying the defendant's motion to sever charges involving the murders of three separate victims for trial; the murders occurred in the same "general locale" near the defendant's residence over 11-month period, each victim was an overweight white female whom the defendant did not know, all were beaten and raped before being murdered "by hand or a hand-held instrument[,]" and the defendant's DNA was recovered from each crime scene).

The progressively watered-down application of the common plan, scheme, or design exception was readily evident in *Commonwealth v. Arrington*, 86 A.3d 831 (Pa. 2014). In that case, Arrington was on trial for murdering his girlfriend, and the trial court permitted the Commonwealth to admit evidence that Arrington had physically assaulted three other ex-girlfriends; several of the prior incidents resulted in criminal convictions. This Court applied a "common scheme" test which amounted to two questions: (1) whether the probative value of the evidence outweighed the prejudice to Arrington; and (2) whether "a comparison of the crimes … establish[ed] a **logical connection** between them." *Id.* at 842 (emphasis added) (*citing Miller*, 664 A.2d at 1318).

The Court determined that the evidence of Arrington's abuse of his former paramours "illustrated a distinct behavioral pattern that strengthened the prosecution's" entirely circumstantial case. *Arrington*, 86 A.3d at 844-845. Furthermore, the Court cited "the shared characteristics of each relationship" to demonstrate Arrington's "common plan or scheme … to preserve intimate relationships through harassment, intimidation, and

physical violence, culminating in the use of a deadly weapon." *Id.* at 844. However, these purported "shared characteristics" consisted of (1) monitoring the daily activities of his girlfriends; (2) becoming violent when the women attempted to leave the relationship or interacted with other men (3) "inflicting head **or** neck injuries with his fist, a handgun **or** an edged weapon;" and (4) threatening or harming "members of his girlfriend's family **or** male acquaintances that he viewed as romantic rivals." *Id.* (emphases added; footnote omitted). Rather than require proof of a "common plan, scheme, or design," the Court permitted evidence that Arrington was a serial abuser — his prior bad acts and crimes did not demonstrate a "*modus operandi*" nor did they reveal one common goal. Rather, as then-Justice Saylor observed in his dissenting opinion, "as the decisional law gravitates further and further away from the centering ground of signature crimes, the identity/propensity distinction devolves to a matter of semantics." *Id.* at 860 (Saylor, J., dissenting) (internal citation omitted).

Our most recent discussion of the common, plan, scheme and design exception was the plurality decision in *Commonwealth v. Hicks*, 156 A.3d 1114 (Pa. 2017). Hicks was tried for murdering the victim, a known prostitute and drug user. Parts of the victim's body were recovered from a road near Hicks' home; her hands were not found at that time. After the investigation led to Hicks as a potential suspect, the police obtained a search warrant for his home and vehicle — they subsequently recovered the victim's hands in a ziplock bag in the wall of his bathroom, as well as the victim's DNA on a scrub brush.

Prior to trial, the Commonwealth provided notice of its intent to present evidence that Hicks had assaulted eight other women "with whom [he] had a sexual and/or prostitution-type relationship, which also involved the use of illegal narcotics such as crack cocaine." *Hicks*, 156 A.3d at 1119. It averred the evidence, which included

beatings and threats, was relevant to prove Hicks' "motive, identity and intent, as well as to rebut any defense based on accidental death[;]" according to the trial court, the testimony "would demonstrate a common scheme … to victimize prostitutes, or women engaged in prostitution to satisfy their addiction to controlled substances, such as the victim in the present case." *Id.* Ultimately, the trial court permitted the testimony of three of the proposed witnesses and instructed the jury that their testimony was for the "very limited purpose of proving intent, motive, common plan or scheme and lack of accident." *Id.* at 1120 (citation and internal quotation marks omitted).

On direct appeal,[11] this Court affirmed in a fractured opinion. Writing for the Majority,[12] Justice Dougherty focused on whether there was a "logical connection" between the prior assaults and the present crime. *Hicks*, 156 A.3d at 1125. He cautioned that "the mere repeated commission of crimes of the same class" was insufficient to establish that connection; rather "[t]he device used must be so unusual or distinctive as to be like a signature." *Id.* at 1125-1126 (citation and internal quotation marks omitted). Relying on the Court's prior decision in *Arrington*, Justice Dougherty identified the following facts as supporting a "logical connection" between Hicks' prior assaults and the victim's murder:

> In each case [Hicks]: (1) was introduced to drug-dependent women of similar body types for purposes of using drugs; (2) showed a sexual interest in the women, sometimes involving prostitution; (3) resorted to violence when the women behaved in a way he found disagreeable; (4) inflicted injuries on each woman by targeting her neck area with his hands, a sharp edged object, or both; and (5) verbally threatened to kill each woman.

---

[11] Hicks was convicted and sentenced to death, which triggers automatic review by this Court on direct appeal. *See* 42 Pa.C.S. § 9711(h)(1).

[12] Both then-Justice Todd and Justice Mundy joined the majority opinion. Then-Chief Justice Saylor and then-Justice Baer both filed concurring opinions, agreeing the other bad acts evidence was admissible, albeit on different bases. Justices Donohue and Wecht each filed a dissenting opinion, asserting that Hicks was entitled to a new trial.

*Hicks*, 156 A.3d at 1127 (footnote omitted). Justice Dougherty described these similarities as a "'virtual signature' for purposes of proving common scheme, intent and identity." *Id.* at 1128. Further, while he recognized the prior bad acts evidence was "highly prejudicial," Justice Dougherty also determined it was "highly probative" since the Commonwealth's case was largely circumstantial. *Id.* Although he acknowledged the victim's hands were recovered from Hicks' home, Justice Dougherty noted that the defense suggested the victim may have died from an overdose, and that Hicks simply disposed of her body after her death. *See id.* at 1128-1129. Accordingly, he determined the trial court did not abuse its discretion when it permitted the Commonwealth to present evidence of Hicks' prior assault of prostitutes.

As noted previously, then-Justice Todd and Justice Mundy joined Justice Dougherty's majority opinion. Then-Justice Baer agreed that the evidentiary ruling was "a close call," but avoided the issue by determining any error was harmless in light of the "overwhelming, and indeed, uncontradicted, evidence as to the manner of the victim's death." *See Hicks*, 156 A.3d at 1139, 1142 (Baer, J., concurring).

Then-Chief Justice Saylor also filed a concurring opinion. He agreed with Justice Donohue's dissent that the Court has, over the years, "incorrectly blended various distinct grounds for relevance associated with proffered, uncharged conduct" and "substantially diluted the putatively stringent standard associated with at least one of these, namely, proof of identity via a *modus operandi* theory." *Hicks*, 156 A.3d at 1130 (Saylor, C.J., concurring). Nevertheless, Chief Justice Saylor remarked that identity was not actually at issue in the case. *See id.* at 1131. Hicks admitted he was with the victim when she died, but insisted the cause of her death was an accidental overdose, and he simply disposed of her body. Rather, Chief Justice Saylor opined "the evidence was employed by the prosecution primarily to establish the *actus reus* of the murder by corroborating"

the testimony of the Commonwealth's expert witness that the victim's death was the result of "homicidal violence." *Id.* (citation omitted). Accordingly, he concluded the logical relevance of the evidence was to negate Hicks' defense that the victim's death was an accident. To achieve this result, Chief Justice Saylor employed the "doctrine of chances." *Id.* at 1132.

Chief Justice Saylor explained that, pursuant to the doctrine of chances,

[T]he proponent does not offer the evidence of the uncharged misconduct to establish an intermediate inference as to the defendant's personal, subjective bad character. Rather, the proponent offers the evidence to establish the objective improbability of so many accidents befalling the defendant **or the defendant becoming innocently enmeshed in suspicious circumstances so frequently**.

*Hicks*, 156 A.3d at 1133 (*citing* Edward J. Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non-Character Theory of Logical Relevance, the Doctrine of Chances,* 40 U. RICH. L. REV. 419, 437 (January, 2006)) (emphasis in original). He also cited the following test employed in Colorado courts to limit the use of this doctrine: (1) are the other acts "roughly similar to the charged crime[;]" (2) is the number of "unusual occurrences" involving the defendant more frequent than the rate for the general population; and (3) "is there a real dispute between the prosecution and the defendant over whether the actus reus occurred[.]" *Id.* at 1136 (*citing People v. Everett*, 250 P.3d 649, 658 (Colo. App. 2010)).

Applying that test to the evidence admitted at trial, Chief Justice Saylor concluded that Hicks' prior bad acts were "roughly similar" and of "a sufficient number … to dispel the appearance of coincidence[.]" *Hicks*, 156 A.3d at 1137. Moreover, considering that Hicks' defense was that, while he was with the victim when she died and later disposed of her body, he did not murder her, Chief Justice Saylor determined the doctrine of

chances supplied a "logical non-character-based relevance criterion" to admit evidence of Hicks' prior bad acts.  *Id.*

Justice Donohue authored a strong dissent, proclaiming that "the Majority contort[ed] the exceptions to the prohibition against the admission of bad acts evidence" in a manner which undermines the purpose of the rule.  *Hicks*, 156 A.3d at 1142 (Donohue, J., dissenting).  While *Shaffner* crafted two exceptions to the rule precluding (propensity) evidence of a defendant's other bad acts — when there is a logical connection between the acts linked for a common purpose or a signature crime — Justice Donohue stated that the *Wable* Court conflated the two.  *See id.* at 1146.  She observed that the facts in *Wable* revealed the defendant employed a "distinct signature method" of executing his crimes; however, the *Wable* Court "indicated that because of the striking similarities between the [other] bad acts and the crimes charged, the bad acts were probative of a **common scheme**."  *Id.* (emphasis added).  According to Justice Donohue, that decision led this Court to merge these separate requirements, and approve the admission of other bad acts with "striking similarities" to the crime charged as proof of a common scheme.  *Id.*  She cited *Arrington* as "the unfortunate culmination of the conflation of the requirements to establish a signature crime with those necessary to establish a common scheme or plan[.]"  *Id.* at 1151.

Justice Donohue proposed that we return to the strict limits placed on the admission of other bad acts evidence outlined in *Shaffner*.  Pursuant to the signature crime exception, Justice Donohue would limit the admission of other bad acts evidence to those acts which share an "uncanny similarity in all the details" to the present crime, "making it impossible not to 'identify the person of the actor.'"  *Hicks*, 156 A.3d at 1145 (citation omitted).  In other words, she pressed for a true *modus operandi* exception, where the other bad acts evidence is "so nearly identical in method as to earmark them

as the handiwork of the accused." *Id.* (*citing Rush*, 646 A.2d at 560-561). Moreover, pursuant to the common plan, scheme, and design exception, Justice Donohue would also permit other bad acts evidence it if is "possible to conclude that the bad acts and the charged crime were 'both contemplated by the [defendant] as parts of one plan in his mind' such that 'it is obvious' that committing the prior act 'was part of his purpose' in committing the charged crime." *Id.* at 1144 (citation and footnote omitted). In other words, the other acts were part of a larger plan that included the crime charged. She concluded that the other bad acts admitted in *Hicks* did not satisfy either exception. Rather, the Majority's decision permitted "the admission of random, unlinked acts so long as it is possible to discern some similarity with the charged crime, no matter how attenuated or unintentional." *Id.* at 1156.

Further, Justice Donohue rejected then-Chief Justice Saylor's application of the doctrine of chances as "merely an excuse for admitting otherwise inadmissible propensity testimony." *Hicks*, 156 A.3d at 1149. She also opined that the trial court's error in admitting the other bad acts evidence was not harmless. *See id.* at 1156-1157.

Justice Wecht authored a dissenting opinion, encouraging this Court to "scrupulously" adhere to the purpose of Rule 404(b) and "strictly limit[]" the admission of other bad acts evidence, as the "numerous and broad" exceptions create a danger of devouring the rule itself. *Hicks*, 156 A.3d at 1158 (Wecht, J., dissenting). While he agreed with Justice Donohue's merits analysis, Justice Wecht would have found the error harmless, particularly since the victim's hands were discovered in Hicks' home. Nevertheless, because the Commonwealth conceded throughout the trial that the prior bad acts evidence was **essential** to its prosecution, and any error in its admission would **not** be harmless, Justice Wecht opined that he would enforce the Commonwealth's concession and grant a new trial. *See id.* at 1158-1159.

With this background in mind, we turn to the arguments of the parties.

### B. Argument of the Parties

Walker calls for a return to *Shaffner*'s "narrowly-tailored" common plan, scheme, or design exception to the preclusion of Rule 404(b) evidence. Walker's Brief at 19. First, he advocates for a "linked plan" requirement, demanding "clear forethought of criminal purpose that encompasses, **from day one**, the intent to commit the charged and uncharged acts." *Id.* at 20, 26 (emphasis in original). Each bad act would be an essential part of this "integrated plan" to achieve a specific goal. *Id.* at 27. Second, Walker presses for a more rigorous application of the *modus operandi* exception, where the "acts must share a unique, signature-like identifier." *Id.* at 28. He insists that this Court's lax application of the purported common plan, scheme, or design exception has led to the admission of "random, unlinked acts so long as it is possible to discern some similarity with the charged crimes, no matter how attenuated or unintentional." *Id.* at 37 (*citing Hicks*, 156 A.3d at 1154 (Donohue, J., dissenting)).

Nonetheless, Walker insists that under either the limited *Shaffner* test, or this Court's more tolerant "shared similarities" test, the trial court should not have consolidated his three rape cases for trial. Walker's Brief at 45-46. First, there was no evidence presented that Walker had a preconceived plan to commit the sexual assaults. Second, the similarities between the crimes were typical of any "stranger rape" case — Walker's methodology did not constitute a *modus operandi*. *Id.* at 46-47 (he approached two of the victims, and the third approached him; he employed two different weapons in two of the rapes and no weapon in the third; and he pressured only two of the three victims to perform oral sex). In fact, the only link between the crimes was the discovery of Walker's DNA. Third, Walker contends that even if the evidence of each rape would be admissible

in a trial for the others, the court failed to "weigh the probative value of the evidence against its potential for prejudice" as required by Rule 404(b)(3). *Id.* at 48. In fact, he notes the Commonwealth conceded that this "corroborative evidence" was **required** to prove Walker's guilt and support the victims' testimony that they did not consent to have sex with Walker. *Id.* at 49-50. Walker maintains that this violates the explicit purpose of Rule 404(b) — to prevent a jury from accumulating evidence against a defendant to infer a criminal disposition. *Id.* Accordingly, he insists he should be granted a new trial.

The Commonwealth responds that Walker confuses the more limited, identity-based "signature crimes" exception to the preclusion of other bad acts evidence — which is not relevant here[13] — with the "common plan or scheme" exception. Commonwealth's Brief at 10, 15 (emphasis omitted). In applying the latter exception, the Commonwealth maintains that we should continue, as we have done for decades, "to evaluate whether there is a **logical connection** between the acts sought to be tried together." *Id.* at 10 (emphasis added). It describes this approach as "more reasonable" than Walker's push for an "overarching scheme or conspiracy" which is not found in the plain language of the Rule. *Id.* at 11. Moreover, the Commonwealth distinguishes the test enunciated in *Shaffner* on its facts, noting that the record in that case did not support the trial court's reason for permitting the other acts evidence, that is, the murder of Sharlock was the motive for the murder of Nancy. *See id.* at 21-22.

Turning to this case, the Commonwealth insists "there was certainly a logical connection between the three rapes committed under broadly similar circumstances." Commonwealth's Brief at 14. In each case, Walker met the victim, a vulnerable

---

[13] The Commonwealth concedes that when other bad acts evidence is admitted to establish the defendant's identity, "a more exacting standard of uniqueness" is required. Commonwealth's Brief at 18. It notes that because here "identity was uncontested[,]" the less stringent test should apply. *Id.* at 19.

stranger,[14] on a public street, and lured her to a secluded outside area where he assaulted her. He employed physical force to control the victims and, in two cases, used a weapon. Moreover, the victims were all between the ages of 21 and 38 years old. The Commonwealth argues that the other acts evidence was not used to prove Walker's identity as the attacker, but rather, to rebut his defense that the victims consented to the sexual encounter. *See id.* at 15. It remarks that it was "hardly unfair to allow the [jury] to see how enormously unlucky [Walker] would have [had] to be to be falsely accused in the same way not merely once, or twice, but three times in a relatively discrete period of time." *Id.* at 16. Finally, the Commonwealth maintains the probative value of the evidence concerning the other rapes far outweighed any potential prejudice to Walker.[15] *See id.* at 23.

### C. Discussion

#### i. *Logical Connection Test*

While both parties and the lower courts focused on the exceptions to Rule 404(b), our analysis must begin with Rule 582. After all, at issue is the trial court's decision to **consolidate** separately charged offenses for a joint trial. That decision is, naturally, a pretrial determination. It is made before a defendant is required to reveal any defense he

---

[14] According to the Commonwealth, "[e]ach victim had some real or perceived vulnerability, including drug use and the third victim's stated unfamiliarity with the area." Commonwealth's Brief at 15.

[15] The Office of the Attorney General of Pennsylvania (OAG) submitted an amicus brief in support of the Commonwealth that largely tracks the Commonwealth's argument. It insists that this Court's application of the common plan, scheme, or design exception since *Shaffner* has not been lax, but rather "the product of years of dedication, experience, and hard work" in an effort to adapt the law to our changing society. Amicus Brief at 12-13. The OAG leans into the "doctrine of chances" as an alternative basis for other acts evidence. It emphasizes that "[c]rime is often an act of opportunity" so that a "'plan' should logically include an offender's opportunistic resort to criminal techniques that succeeded for him previously." *Id.* at 15. Here, the OAG insists the other acts evidence was relevant to rebut Walker's defense of consent.

may have to the crimes charged. As noted *supra*, consolidation of separate informations is permitted if, in the trial court's discretion, "the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion[.]" Pa.R.Crim.P. 582(A)(1)(a). In considering whether the evidence of each offense would be admissible in a separate trial for the others, we are required to turn to Rule 404(b)(2) and its exceptions to the rule precluding evidence of a defendant's other bad acts or crimes.

The overarching objective of Rule 404(b) in a criminal case is to guard against a conviction based **solely** on a defendant's bad character or perceived propensity to commit crimes. The key word, however, is "solely." Both the Rule itself and our case law permit evidence of a defendant's other bad acts or crimes when that evidence is relevant for another legitimate purpose. *See* Pa.R.E. 404(b)(2) (providing non-exclusive list of other relevant purposes). The problem is, over the years, those "other purpose" exceptions have threatened to swallow the intention of the Rule. This is especially true of the judicially-crafted common plan, scheme, or design exception.

As envisioned in *Shaffner*, the common plan, scheme or design exception was limited. Evidence of other crimes or bad acts committed by the defendant was admissible in two circumstances: (1) when the acts were each an integral part of one plan in the defendant's mind to achieve a common goal; or (2) when the prior act was so similar to the one charged that "he who committed the one must have done the other." *Shaffner*, 72 Pa. at 65. Although both *Shaffner* exceptions are often discussed in connection with the common plan, scheme, or design exception, the second exception — the *modus operandi* exception — more appropriately applies to the "identity" exception listed in Rule

404(b)(2).[16] This exception may be invoked when the other acts or "crimes of the accused (are) so nearly identical in method as to earmark them as the handiwork of the accused." *Commonwealth v. Morris*, 425 A.2d 715, 720 (*citing* 1 McCormick On Evid. § 190 at 449 (2d Ed. 1972)). It requires more than "the mere repeated commission of crimes of the same class[;]" instead, "[t]he devise used must be so unusual or distinctive as to be like a signature." *Id.* (*citing* 1 McCormick On Evid. § 190 at 449 (2d Ed. 1972)). As the Commonwealth concedes in its brief, the identity-based, signature crime exception is **not** implicated here. *See* Commonwealth's Brief at 19.

Nevertheless, in affirming the trial court's decision to consolidate Walker's three rape cases for trial, the Superior Court rested upon the "common plan or scheme exception," while referring to the "striking" similarities between each of the assaults. *Walker*, 309 A.3d at *6 (finding a "[s]ufficient commonality of factors between the incidents [to] dispel[] the notion that they are merely coincidental and permit[] the contrary conclusion that they are so logically connected[,] they share a perpetrator") (citation omitted). As mentioned above, this "logical connection" or "sufficient similarities" test, invoked by the Superior Court, arose from our decisions in *Rush*, *Miller*, and *Arrington*. *See Rush*, 646 A.2d at 560-561; *Miller*, 664 A.2d at 1318-1319; *Arrington*, 86 A.3d at 842. The test does not demand the same high level of similarities between the acts as admission under the *modus operandi* or signature crime exception. *See* 1 McCormick On Evid. § 190.3 (9th ed.) ("The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.") (footnote omitted). Nor does the "logical connection" test require proof of an overarching plan or scheme linking the criminal acts together, as envisioned in *Shaffner*. *See Shaffner*, 72 Pa. at 65. Rather, it appears to be

---

[16] *See* Pa.R.E. 404(b)(2) (while evidence of a defendant's other bad acts is inadmissible to prove the defendant's character, it may be admissible "for another purpose, such as proving … identity[, but] only if the probative value of the evidence outweighs its potential for unfair prejudice").

a hybrid of these two traditional exceptions — while there is no previously conceived plan linking the bad acts, they are **similar enough** for a jury to conclude the same perpetrator committed them. However, the time has come for this Court to acknowledge that the "logical connection" test runs afoul of the purpose of Rule 404(b) and invites the admission of impermissible propensity evidence.

As a leading commentator observed, "[i]f anything, the rule against using character evidence to prove conduct on a particular occasion applies even more strongly in criminal cases." 1 McCormick On Evid. § 190 (9th Ed.). Our case law has strayed from the traditional exceptions to the preclusion of other bad acts evidence and teetered on the line of allowing propensity evidence in the name of a common plan, scheme or design, resulting in undue prejudice to defendants. Today, a common plan or scheme simply requires "shared characteristics" between the crimes and the victims. This is readily apparent in our decisions in *Hicks* and *Arrington*.

In *Hicks*, we permitted evidence of the defendant's prior assault of women during his murder trial. The other women, like the victim, were drug-dependent. They each testified that they had sexual encounters with the defendant, that also involved drugs, and he became violent after an argument, which led him to threaten and choke them. *See Hicks*, 156 A.3d at 1121-1122. In contrast, the murder victim's body parts were recovered in various garbage bags along the road; her head and hands were severed. The only evidence of the defendant's relationship with the victim was the testimony of the victim's friend, who stated the victim brought the defendant to her friend's home a few days before her body was found and the victim seemed "nervous and withdrawn." *Id.* at 1117. There was no evidence the defendant had assaulted the victim.

Similarly, in *Arrington*, the defendant was on trial for murdering the victim, his former girlfriend, whom he had physically abused for years, and harassed and threatened

after she filed a criminal complaint against him. *See Arrington*, 86 A.3d at 837-838. At trial, the Commonwealth presented evidence that the defendant had physically assaulted three other former girlfriends, then attempted to preserve those relationships through harassment, and harmed or threatened to harm their male friends. *See id.* at 844. Again, we agreed the evidence was admissible "to establish [the defendant] acted pursuant to a common plan or scheme." *Id.*

Neither *Hicks* nor *Arrington* involved "signature" crimes. While the defendants' other bad acts were clearly "similar" to the offense for which he was on trial, they could not be characterized as "so unusual or distinctive as to be like a signature." See *Morris*, 425 A.2d at 720 (citation omitted). The same is true here. In two of the cases, Walker initiated contact with the victims; the third victim approached him. Two of the assaults occurred in the late morning; the third assault occurred near midnight. Each sexual assault occurred in a different Philadelphia neighborhood. Although Walker convinced all three victims to follow him to a secluded area, in one case, he held a knife to her neck while doing so. He did not otherwise physically assault that victim; however, he punched another victim, and struck the third victim with a tire iron. He forced two of the three victims to perform oral sex on him before raping them. He robbed only one victim. One rape occurred three years before the other two. Plainly, the three rapes for which Walker was charged cannot be linked as signature crimes.

Nor do the three charged rape cases satisfy *Shaffner*'s common plan or scheme exception. There was no evidence presented that Walker had a preconceived goal in mind, other than satisfying his own salacious interests. Rather, the evidence reasonably suggested he raped women when he was presented with the opportunity to do so. The crimes were not linked together in order to achieve a common goal. *See Shaffner*, 72 Pa. at 66 (evidence of Sharlock's poisoning would have been admissible in trial for

Nancy's death if the Commonwealth had presented evidence that the defendant "contemplated the death of Nancy before taking the life of Sharlock[;]" *i.e.*, for the purpose of marrying Sharlock's wife).

Thus, in this case, consolidation of the three rape cases was proper only if we continue to endorse the "logical connection" test in *Arrington* and *Hicks*. However, as we have already determined, this test ignores the purpose of Rule 404(b) and allows for the admission of pure propensity evidence. We conclude it is time to return to the origin of the common plan, scheme, or design exception, and limit the admission of other bad acts evidence to those cases involving a common goal (*i.e.*, "linked plan") or a signature crime.

### ii. Common Goal Test

The common plan, scheme, or design exception has become a misnomer. We have never recognized a common **plan**, a common **scheme**, and a common **design** as three distinct exceptions. Rather, this Court has used the terms interchangeably. *See Hicks*, 156 A.3d at 1128 (noting the circumstances between the cases "present a 'virtual signature' for purposes of proving common scheme, intent and identity"); *id.* at 1146 ("common scheme exception should be limited to circumstances from which a true plan or motive can be inferred") (Donohue, J., dissenting); *Arrington*, 86 A.3d at 844 (evidence of defendant's assaults of other women admissible to show he "acted pursuant to a common plan or scheme"); *Miller*, 664 A.2d at 1318 (evidence of defendant's prior offenses established his "common design in luring similar type victims into his vehicle, taking them to remote area for sexual purposes against their will and brutally beating them in a similar manner"); *Newman*, 598 A.2d at 278-279 (consolidation of separate rape offenses proper; evidence of each incident would have been admissible in trial for the other under "common design" exception).

Indeed, the use of all three terms seems to be repetitive. Black's Law Dictionary defines "scheme" as "[a]n artful plot or **plan**, usu[ally] to deceive others[,]" and "design" as "[a] **plan or scheme**." Black's Law Dictionary (12th Ed. 2024) ("SCHEME") (emphasis added); *id.* ("DESIGN") (emphasis added). However, drawing from our decision in *Shaffner*, we can interpret a "common design" as a signature crime — a defendant exhibits a "common design" when the facts of the other bad acts and the offense on trial are so unique and distinctive that they must have been committed by the same culprit. The signature crime, or *modus operandi*, exception is most relevant when the identity of the perpetrator is at issue.

Similarly, *Shaffner* and its progeny lead us to a clear definition of the "common plan or scheme" exception. In order to admit a defendant's other bad acts or crimes under this exception, the Commonwealth must demonstrate that those bad acts or crimes are linked to one common goal and are part of a plan to accomplish that goal. Perhaps a defendant intended to murder the victim but did not own a firearm or have a firearm license. A few days before the murder, he broke into his neighbor's home to steal a gun which he intended to (and later did) use as the murder weapon. Under the common plan exception, the evidence of the burglary and unlawful possession of the firearm would be admissible during the defendant's trial for the murder (and vice versa). All of the crimes committed by the defendant were linked to, and part of, his preconceived plan to achieve a common goal — murder the victim.

That is not to say that every crime or bad act must have been contemplated in the formulation of the common plan. Instead, what is required is that acts were committed **in furtherance of** a singular goal. Consider, for example, a defendant who robs a bank. During his getaway, he leads police on a highspeed chase and hits a pedestrian. He initially escapes and breaks into a home to lie low. A few days later, he steals a car before

he is arrested. Under the common plan or scheme exception, each of the defendant's crimes (robbery, assault, burglary, and theft) would be admissible in a trial for the others, as they were all committed in furtherance of a common goal — to rob the bank and escape with the proceeds.

Turning back to Walker's case, the Commonwealth failed to present any evidence of a preconceived plan or common goal linking the three rapes together. Surely, Walker's desire to rape women is not enough. And, as discussed *supra*, the facts of each rape were not so unique or distinctive as to qualify as signature crimes. Rather, the Commonwealth and the lower courts relied on the "logical connection" between these similar stranger rapes, a far too lax interpretation of the common plan, scheme or design exception, which we now reject.

Our decision today is not so much a break from prior rulings as it is a reaffirmation of the vital safeguards Rule 404(b) provides in criminal prosecutions. By permitting other bad acts evidence based solely on a "logical connection" between similar crimes, we run the very real risk of admitting pure propensity evidence.

Notably, however, the Commonwealth provides an additional basis to support the lower courts' rulings. It emphasizes the relevance of the other crimes to rebut Walker's defense that the victims consented to the sexual encounters. *See* Commonwealth's Brief at 15. Along this same reasoning, the Commonwealth invokes the "doctrine of chances," asserting: "It was hardly unfair to allow the fact finder to see how the enormously unlucky [Walker] would have to be to be falsely accused in the same way not merely once, or twice, but three times in a relatively discrete period of time." *Id.* at 16.

This Court has rarely employed the "doctrine of chances" and when we have, it has been to admit evidence of a defendant's other bad acts to rebut the defendant's claim that the victims' deaths were the result of an accident. *See Commonwealth v. Donahue*,

549 A.2d 121, 127 (Pa. 1988) (admitting evidence that defendant had previously abused another child "as probative" of whether the injuries the child suffered in the case on trial were accidental, as the defendant claimed); *Commonwealth v. Boykin*, 298 A.2d 258, 261-262 (Pa. 1972) (plurality) (permitting police detective to testify in rebuttal that defendant, on trial for smothering her infant, had confessed to smothering two other infants in her care to stop them from crying; "these previous admissions [are] logically relevant to a determination of whether [the infant's] death was due to an innocent accident" as defendant claimed). Moreover, these cases involved the admission of other bad acts evidence **during** trial — not the consolidation of separate cases for a joint trial. That distinction is significant. While the Commonwealth insists the three rape cases should have been tried together to rebut Walker's defense of consent, the decision to consolidate cases was made **pretrial**, when the defense strategy was still unknown. The Commonwealth may have correctly presumed that Walker would assert a consent defense since his DNA was recovered during the victims' sexual assault examinations. However, we cannot sanction the admission of highly prejudicial other bad acts evidence based on the Commonwealth's anticipatory rebuttal of a potential defense. "It is well-established that the defendant has **no duty** to present evidence and may instead rely on the presumption of innocence and the Commonwealth's burden of proof." *Yale*, 249 A.3d at 1018 (*citing Commonwealth v. Smith*, 17 A.3d 873, 908 (Pa. 2011) (emphasis added)). We cannot tolerate the admission of highly prejudicial "similar" bad acts evidence in the name of rebutting a defense that the defendant has not yet asserted.[17] Thus, we

---

[17] Again, we emphasize that the question before us concerns the (pretrial) consolidation of Walker's separate rape cases under the common plan, scheme, or design exception. The admission of evidence to rebut a potential consent defense is not the question before us. If Walker chooses to present a consent defense during his retrials, the Commonwealth then may seek to admit evidence of the other rape cases on the basis of (continued…)

conclude the consolidation of separate offenses for a joint trial is permitted if, *inter alia*, the evidence of each offense would be admissible in a trial for the others as an exception to the rule precluding propensity evidence. *See* Pa.R.Crim.P. 582(A)(1)(a); Pa.R.E. 404(b). When the admissibility of the defendant's other bad acts is premised upon the common plan, scheme, or design exception, the Commonwealth must establish either: (1) the offenses constitute "signature crimes" — that is, they are so unique and distinctive that they must have been committed by the same perpetrator — or; (2) the offenses were linked to achieve a common goal.[18] *See Shaffner*, 72 Pa. at 65. Moreover, a court may

_____

another Rule 404(b)(2) exception. We offer no opinion on the potential success of such a motion.

[18] The Dissent views this Court's Rule 404(b) jurisprudence since *Shaffner* differently — *Wable* was an "opportunity to further hone and define" the admissibility standard for other acts evidence and *Hicks* "whittled the contours of the common plan, scheme, or design exception[.]" Dissenting Opinion at 14-15. Indeed, the Dissent insists our case law since *Shaffner* has endeavored "to craft a workable standard for the use of other acts evidence to prove a common plan, scheme, or design in the modern era." *Id.* at 20. Thus, when identity is not at issue, the Dissent proposes a common plan, scheme, or design exception where other acts evidence is admissible so long as there are "certain similarities" between the crime charged and those other acts; in other words, the defendant acted in accordance with his own "'criminal playbook' of sorts." *Id.* at 21, 29.

The Dissent's viewpoint certainly has some appeal — obviously, a defendant whose DNA matched the rape kit samples from three separate victims of three separate stranger rapes on three different dates committed all three rapes, right? Therein lies the problem. Absent any evidence that the crimes were linked to achieve a common goal, or that the facts of each rape were so similar that they constituted a "signature crime," the likelihood that a jury would convict the defendant **solely** because he is a "bad" man — he was accused of rape three times! — is extreme. This type of propensity evidence is precisely what Rule 404(b)(1) intended to preclude.

Moreover, the Dissent focuses primarily on the admissibility of other acts evidence during trial. As noted *supra*, the evidence of the other rapes **may** be admissible during trial for another purpose — that is, to rebut a defense of consent. However, we are concerned with the **consolidation** of multiple, separate crimes for a joint trial. Our application of the common plan, scheme, or design exception should be even more discerning in these circumstances.

not grant consolidation under another Rule 404(b) exception premised upon an **assumed** defense before the defendant presents that defense at trial.

### iii. Justice Dougherty's Concurrence

In the concurrence section of his Concurring and Dissenting Opinion, Justice Dougherty agrees the time has come to reject the logical connection test. Nonetheless, he proposes we leave open the possibility that — in another case with different facts — we might admit other acts evidence under the "unlinked plan" theory. Concurring and Dissenting Opinion at 6. He describes this theory as requiring a plan — *i.e.*, forethought by the defendant — with "[p]reparatory steps" that "were committed in a manner **nearly identical**" to the other charged offenses. *Id.* at 11-13 (citation omitted; emphasis in original). In other words, in Justice Dougherty's view, prior bad acts evidence that satisfies a *modus operandi* may be admissible in a case where identity is not at issue. However, Justice Dougherty also proposes that "since the evidence is not being used to prove identity, there would be no need for the acts to be signature-like or especially distinct." *Id.* at 12 n.6. At best, the "unlinked plan theory" is another name for *modus operandi* evidence; at worst, it is the logical connection test with a plan. Suffice it to say, had Walker's crimes demonstrated a true *modus operandi*, this Court would certainly permit consolidation, despite the fact that DNA evidence purportedly identifies him as the culprit.

### iv. Mandate

Accordingly, in the present case, the trial court abused its discretion when it granted the Commonwealth's motion to consolidate the three rape cases for trial. The evidence of each of the offenses would not be admissible in a separate trial for the others pursuant to the common plan, scheme and design exception to the prohibition against

propensity evidence.  Thus, Walker is entitled to  a new trial in each case.[19]  We therefore

vacate the judgment of sentence and remand for further proceedings.

---

[19] Justice Dougherty also  strongly advocates that upon remand the Commonwealth may still seek to consolidate  the cases "on some other theory, like lack of consent or the doctrine of chances."  Concurring and Dissenting Opinion at 18.  Addressing these in reverse order, we have already explained that the doctrine of chances has been employed in this Commonwealth sparingly, and only to admit prior bad acts evidence during trial to **rebut** a defendant's claim that the victim's injures or death was accidental.  *See supra* at 35.  While Justice Dougherty cites then-Chief Justice Saylor's discussion of the doctrine in *Hicks*, one Justice's endorsement in a concurring opinion (that was not joined by any colleagues) is not grounds for our wholesale adoption of the theory.  Moreover, as discussed *supra*, the doctrine is inapplicable in this pretrial setting.  If, during trial for one of the incidents, Walker asserts that he **mistakenly** believed the victim consented to the sexual acts, the Commonwealth may request to admit the evidence of the other acts to prove an absence of mistake or accident.  *See Donahue*, 549 A.2d at 127 (evidence of defendant's prior abuse of another child was "probative" to rebut defendant's assertion that injuries child suffered in case on trial were accidental).

However, Justice Dougherty proposes the other crimes evidence may also be admissible to prove the victims' lack of consent, which is an element of the crime of rape, and therefore is not limited to rebuttal.  *See* Concurring and Dissenting Opinion at 17-18 (*citing Commonwealth v. Boczkowski*, 846 A.2d 75 (Pa. 2004)).  In *Boczkowski*, before the trial for the murder of defendant's second wife, the Commonwealth filed a motion in *limine* to introduce evidence that the defendant had been arrested for the murder of his first wife, who died under very similar circumstances.  *See Boczkowski*, 846 A.2d at 439.  Although the trial court ruled the evidence was admissible only in rebuttal, the Superior Court, in a divided opinion following an interlocutory appeal, affirmed in part and reversed in part.  *See id.*  The majority concluded the Commonwealth could admit the evidence during its case-in-chief.  *See id.* at 440.  On appeal following the defendant's first-degree murder conviction and death sentence, we rejected the defendant's claim that the evidence was admissible only in response to the defendant's defense of accident: "At least for purposes of a homicide prosecution, where the victim, of course, is unavailable, we reject the notion that proof of an absence of accident is admissible only for responsive purposes."  *Id.* at 444.  We went on to discuss the facts of the case, noting that the defendant's version of events "clearly suggested an accidental death[;]" thus, the prior acts evidence was important for the Commonwealth to "demonstrate [the] implausibility" that the victim's death was accidental.  *Id.* at 444-445 (defendant told paramedics: victim consumed 14 beers on the night of her death; he left her in the hot tub while he took a shower; and when he returned he found her unconscious and face up).  While the *Boczkowski* Court concluded that prior bad acts evidence in that case was admissible in the Commonwealth's case-in-chief — regardless of any alleged defense — a close reading confirms that decision was influenced by the particular facts of that case.  Thus, *Boczkowski* does not affect our ruling here.
(continued…)

## IV. RAPE KIT REPORTS

### A. Confrontation Clause & Hearsay

Both before the Superior Court and in this appeal, Walker's challenge to the admission of the rape kit reports is two-fold. He asserts the admission of the reports violated both his constitutional right to confront witnesses against him and the Pennsylvania Rules of Evidence precluding hearsay.

The Sixth Amendment to the United States Constitution guarantees all criminal defendants the right to confront their accusers in a public trial.[20] *See* U.S. CONST. amend VI ("In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him[.]"). Thus, absent a defendant's opportunity to cross-examine a witness, that witness's out of court statements are not admissible at trial. Traditionally, however, the United States Supreme Court permitted the admission of these out of court statements if the declarant was unavailable, and the statements bore "adequate indicia of reliability[,]" that is, they either fell within a "firmly rooted hearsay exception" or displayed "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004).

In *Crawford*, *supra*, however, the Supreme Court returned the Confrontation Clause to its roots. The Court recognized that "the Framers would not have allowed

---

While we acknowledge the Commonwealth may assert other theories for consolidating the three cases upon remand, we note that none of the other Justices joined the Concurring and Dissenting Opinion, which seems to support joinder based upon the doctrine of chances or lack of consent.

[20] The Sixth Amendment is applicable to the states through the Fourteenth Amendment. *See Commonwealth v. Le*, 208 A.3d 960, 972 n.11 (Pa. 2019). Moreover, our own Constitution provides the same protection. *See* Pa. CONST., Art. 1, § 9 ("In all criminal prosecutions the accused hath a right … to be confronted with the witnesses against him[.]"). Walker does not argue that the Pennsylvania Constitution provides greater protection against Confrontation Clause violations than the Sixth Amendment.

admission of testimonial statements of a witness who did not appear at trial **unless** he was unavailable to testify, and the defendant had **had a prior opportunity for cross-examination**." *Crawford*, 541 U.S. at 53-54 (emphases added). Accordingly, the Supreme Court abrogated the "amorphous, if not entirely subjective, concept" of reliability set forth in *Roberts*, and held that "[w]here testimonial evidence is at issue, … the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 63, 68. Because *Crawford* concerned the admission of a witness's tape-recorded statement following a police interrogation — clearly, a "testimonial statement" — the Court deemed it unnecessary to provide a comprehensive definition of the term. *See id.* at 52, 68. However, the *Crawford* Court detailed the following examples of "testimonial statements:"

> *ex parte* in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would **reasonably expect to be used prosecutorially**[;] … extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[; and] statements that were **made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial**[.] …

*Id.* at 51-52 (citations and internal quotation marks omitted; emphases added).

Two years later, in *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court clarified that not all statements made to police during the course of an investigation qualify as testimonial for purposes of the Confrontation Clause: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 822. Notably, the Court reiterated its focus on the primary purpose of the out of court statement, explaining statements are "testimonial when the circumstances objectively indicate … that the **primary purpose of the**

**interrogation is to establish or prove past events that may be relevant in a future prosecution**."[21]  *Id.* (footnote omitted; emphasis added).

Plainly, however, both *Crawford* and *Davis* concerned traditional statements by witnesses to police.  Beginning with *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the Supreme Court recognized this Sixth Amendment protection applies equally to forensic reports.  In that drug-trafficking case, the prosecution was permitted to admit into evidence "affidavits reporting the results of forensic analysis which showed that the material seized by police and connected to the defendant was cocaine" absent the in-person testimony of the analysts.  *Id.* at 307.  The Court concluded that was error.  The affidavits, by their very name, constituted "testimonial statements."  *Id.* at 310.  The Court opined that the "sole purpose of the affidavits was to provide *prima facie* evidence of … the analyzed substance" and function as an alternative to "live, in-court testimony[.]"  *Id.*

---

[21] That focus is clear from the *Davis* Court's holdings.  *Davis* involved two appeals — one from the Supreme Court of Washington (*Davis v. Washington*), and the other from the Supreme Court of Indiana (*Hammon v. Indiana*).  *See Davis*, 547 U.S. at, 817, 819.  In each case, the defendant was charged with domestic abuse crimes, and the victim failed to appear at trial.  In *Davis*, the court permitted the prosecution to introduce into evidence the victim's statements to the 911 operator.  The Supreme Court concluded the statements were nontestimonial because "the circumstances of [the victim's] interrogation objectively indicate[d] its **primary purpose was to enable police assistance to meet an ongoing emergency**."  *Id.* at 828 (emphasis added).

Conversely, in *Hammon*, when the police responded to a reported domestic disturbance call, the victim told the police that "nothing was the matter."  *Davis*, 547 U.S. at 819 (citation omitted).  After they continued to investigate and isolated the victim from the defendant, the victim completed a "battery affidavit," in which she confirmed that the defendant had physically abused her.  *See id.* at 820.  When the victim failed to appear for trial, the trial court permitted the officer to testify as to the victim's statements and allowed the prosecution to enter the "battery affidavit" into evidence as a present sense impression.  *See id.* The Supreme Court, however, concluded the statements in *Hammon* were "not much different from the [albeit more formal] statements [the Court] found to be testimonial in *Crawford*."  *Id.* at 829.  "There was **no emergency in progress**" and "the primary, if not indeed the sole, **purpose of the interrogation was to investigate a possible crime**[.]"  *Id.* at 829-830 (emphases added).

at 310-311 (citation and quotation marks omitted). Thus, the *Melendez-Diaz* Court held: "Absent a showing that the analysts were unavailable to testify at trial and that [Melendez-Diaz] has a prior opportunity to cross-examine them, [he] was entitled to 'be confronted with' the analysts at trial."[22] *Id.* at 311 (citation and footnote omitted).

Two years later, the Supreme Court considered whether the testimony of a "surrogate analyst" was sufficient to satisfy the constitutional requirements of the Confrontation Clause. *See Bullcoming v. New Mexico*, 564 U.S. 647 (2011). *Bullcoming* involved a drunk driving prosecution in which the "[p]rincipal evidence" against Bullcoming was "a forensic laboratory report certifying [his] blood-alcohol concentration was well above the threshold" for prosecution. *Id.* at 651. The prosecution did not call the analyst who tested the blood sample and signed the certification as a witness; rather, it introduced the report as a "business record" during the testimony of a scientist who worked at the same laboratory, but did not observe or review the analysis. *Id.* at 655. The Supreme Court determined the admission of the lab report, absent testimony from its author, violated Bullcoming's Confrontation Clause rights.

First, the Court considered the state's assertion that the testimony of the surrogate witness was sufficient because he was a qualified expert witness with respect to the testing equipment and the laboratory's procedure. *See Bullcoming*, 564 U.S. at 661. The Court, however, rejected that claim, emphasizing the Confrontation Clause does not tolerate "questioning one witness about another's testimonial statements" simply because

---

[22] Notably, the *Melendez-Diaz* Court rejected the state's argument that the affidavits were "akin to" records of regularly conducted business activity, admissible at trial as an exception to the hearsay rules. *See Melendez-Diaz*, 557 U.S. at 321. The Court explained: "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — **they are not testimonial**." *Id.* at 324 (emphasis added).

a court believes that technique "provides a **fair enough** opportunity for cross-examination." *Id.* at 662 (emphasis added). The Supreme Court also rejected the state's assertion that the report was nontestimonial, concluding, as in *Melendez-Diaz*, the "document [was] created solely for an evidentiary purpose … made in aid of a police investigation[.]" *Id.* at 664 (citation and quotation marks omitted). Thus, the Court determined Bullcoming was entitled to a new trial.[23]

The Supreme Court's next foray into the parameters of the Confrontation Clause with respect to forensic evidence was its (now abrogated) plurality decision, *Williams v. Illinois*, 567 U.S. 50 (2012) (plurality), *abrogated by Smith v. Arizona*, 602 U.S. 779 (2024). In that case, Williams was on trial for rape. Law enforcement sent swabs from the victim's sexual assault examination to Cellmark, a laboratory which produced a DNA profile. At trial, the prosecution called a DNA expert who matched the profile provided by Cellmark to Williams; no analyst from Cellmark testified. *See id.* at 60-61 (plurality). Williams objected when the expert testified that the profile provided by Cellmark was "produced from semen found on the victim's vaginal swabs." *Id.* at 57. Notably, the Cellmark report was not admitted into evidence, and the expert "did not quote or read from the report; nor did she identify it as the source of any of the opinions she expressed." *Id.* at 62.

The Court's fractured decision provided two primary bases for admitting the expert's testimony. Four justices, led by Justice Alito,[24] determined that this "basis evidence" was admissible, not for its truth, but to "help the factfinder understand the

---

[23] In an opinion concurring in part, Justice Sotomayor emphasized that the case did not concern the testimony of a reviewer or supervisor who had some (perhaps oversight) involvement in the testing procedure, or an expert who provided an "independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *See Bullcoming*, 564 U.S. at 672-673 (Sotomayor, J., concurring in part).

[24] Chief Justice Roberts, as well as Justices Kennedy and Breyer, joined Justice Alito's opinion.

expert's thought process and determine what weight to give the expert's opinion." *Williams*, 567 U.S. at 78. Five justices disagreed, concluding that the only purpose of introducing the "basis evidence" was for its truth. *See id.* at 106 (Thomas, J., concurring); 129-130 (Kagan, J., dissenting).[25] However, Justice Thomas agreed with the plurality's second basis for finding no constitutional violation — the Cellmark report did not qualify as a "witness[] against" Williams because it was "not prepared for the primary purpose of accusing a targeted individual." *See id.* at 82, 84 (plurality). While he disagreed with the plurality's "targeted individual" focus, Justice Thomas concluded the report was nontestimonial because it lacked "the solemnity of an affidavit or deposition," as it was neither "a sworn nor a certified declaration of fact." *Id.* at 111 (Thomas, J., dissenting).[26] As discussed *infra*, the Court recently abrogated this decision.

Guided by *Melendez-Diaz*, *Bullcoming*, and *Williams*, this Court, over the past decade, has considered several Confrontation Clause claims in the context of forensic reports. In *Commonwealth v. Dyarman*, 73 A.3d 565 (Pa. 2013), we held that "the admission of accuracy and calibration certificates for breath test machines without testimony from the individual who performed the testing and prepared the certificates" did not violate the defendant's constitutional right to confront witnesses against him. *Id.* at 566. We concluded the certificates were "nontestimonial in nature because they were not prepared for the **primary purpose** of providing evidence in a criminal case[.]" *Id.* at 569 (emphasis added).

That same year, in *Commonwealth v. Yohe*, 79 A.3d 520 (2013), we considered whether a defendant's Confrontation Clause rights were violated when the author of the forensic toxicology report testified to establish the defendant's blood alcohol content at

---

[25] Justices Scalia, Ginsburg and Sotomayor joined Justice Kagan's dissenting opinion.

[26] In *Smith*, discussed *infra,* the Court abrogated Justice Alito's "basis evidence" test. *See Smith*, 602 U.S. at 792-800.

trial, but the lab technicians who tested the defendant's blood samples did not testify. First, relying upon *Melendez-Diaz* and *Bullcoming*, we determined that the toxicology report was testimonial. *See id.* at 554-555 (concluding "the report was made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial and was plainly created for an evidentiary purpose") (citations and internal quotations omitted). Nevertheless, we observed that while those decisions require testimony by the analyst before a forensic report is admitted, they "left unresolved precisely **who** the analyst is or, in circumstances involving multiple analysts, **which** analyst or analysts must testify." *Id.* at 538 (emphases added).

After distinguishing *Melendez-Diaz* (no live testimony) and *Bullcoming* (testimony by an uninvolved surrogate analyst), this Court determined that testimony of the supervisor "who examined [the raw] data [supplied by the lab technicians] and formed his own independent expert opinion," which he expressed in both his report and live testimony, was sufficient to protect Yohe's Confrontation Clause rights. *Yohe*, 79 A.3d at 539. Indeed, the testifying supervisor was "**the analyst** whose statements in the [forensic report] constitute[d] the testimony triggering the right to confrontation." *Id.* at 563 (emphasis added).

More recently, in *Commonwealth v. Brown*, 185 A.3d 316 (Pa. 2018), we applied this same jurisprudence to conclude that an autopsy report is testimonial in nature and may not be introduced into evidence absent accompanying testimony by its author. *See id.* at 329. Although we recognized that some other jurisdictions consider autopsy reports nontestimonial "because they are not created primarily for presentation in a criminal trial[,]" we emphasized that Pennsylvania law "requires the preparation of autopsy reports in all cases of sudden, violent, and suspicious deaths, or deaths by other than natural

causes[,]" and, if the medical examiner concludes the death was the result of a criminal act, the law requires him to report that result to the local district attorney. *Id.* (citations omitted). Thus, we held that "the primary purpose for preparation of an autopsy report under these circumstances is to establish or prove past events potentially relevant to a later criminal prosecution[.]" *Id.* Although the medical examiner who authored the autopsy report did not testify at Brown's trial, we determined the court's decision to admit the report through the testimony of another medical examiner was harmless error.[27] *See id.*

That brings us to the United States Supreme Court's June 2024 decision in *Smith v. Arizona*, 602 U.S. 779 (2024). *Smith*, like *Melendez-Diaz*, involved a forensic drug test report. Law enforcement officers seized purported drugs from a shed and sent them to a lab for forensic analysis. The assigned analyst tested the items and documented her results — that the items were, in fact, controlled substances — in a report. *See id.* at 790. However, prior to trial, the prosecution amended its witness list to indicate that the assigned analyst would no longer be testifying at trial; instead, a "substitute expert" would provide an "independent opinion on the drug testing performed" by the assigned analyst. *Id.* (citations omitted). This substitute expert, "who had not participated in any of the relevant testing[,]" provided general testimony regarding the scientific testing performed and the laboratory's policies and procedures, before confirming that in his "independent

---

[27] This Court's most recent discussion of the parameters of the Confrontation Clause protections was in *Commonwealth v. Weeden*, 304 A.3d 333 (Pa. 2023). In that case, we considered whether the admission of a summary report from a "ShotSpotter" gun detection program violated a defendant's rights under the Confrontation Clause. In concluding that it did not, we emphasized the testimony of the detective, who explained that "when ShotSpotter detects a relevant sound [*i.e.*, a gunshot], the program automatically generates a written summary which provides the date, time, and location of the suspected gunshot." *Id.* at 336. Applying the United States Supreme Court's "primary purpose test[,]" we concluded the ShotSpotter summary is **nontestimonial** because the primary purpose of recording the data is "to assist law enforcement in responding to an ongoing emergency." *Id.* at 350 (footnotes omitted).

opinion" the items tested were controlled substances. *Id.* at 791. After Smith was convicted, the Arizona Court of Appeals affirmed, concluding the substitute expert "could constitutionally present his independent expert opinions as based on his review of [the assigned analyst's] work." *Id.* at 792 (citation and internal quotation marks omitted). The Supreme Court granted *certiorari* review.

Writing for the Majority, Justice Kagan employed a two-step analysis to determine whether the admission of the assigned analyst's statements through the testimony of the substitute expert violated Smith's constitutional right to confront witnesses against him: (1) were the statements offered for their truth; and if so (2) were the statements testimonial? *See Smith*, 602 U.S. at 792-793, 800 (explaining the Confrontation Clause applies **only** to "testimonial hearsay," and "those two issues are separate from each other") (emphasis omitted).

Justice Kagan first considered whether the statements of the assigned analyst were admitted for their truth. *See Smith*, 602 U.S. at 793 ("[T]he Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'") (*citing Crawford*, 541 U.S. at 60 n.9). She explained that the "whole point" of disclosing the assigned analyst's statements was for their truth, as the statements provided "a basis for the jury to credit" the substitute expert's opinion. *Id.* at 795 (citation omitted). She noted: "[T]ruth is everything when it comes to the kind of basis testimony presented here." *Id.* Justice Kagan highlighted that the Confrontation Clause is implicated because "the defendant ha[d] no opportunity to challenge the veracity of the out-of-court assertions that are doing much of the work." *Id.* at 796. Thus, she concluded the underlying statements of the assigned analyst were admitted for their truth. *See id.* at 800 (explaining the substitute expert "effectively became [the assigned analyst's] mouthpiece").

Next, Justice Kagan turned to the second step test of the Confrontation Clause test — determining whether the out-of-court (hearsay) statements were testimonial. *See Smith*, 602 U.S. at 800. She explained that this consideration "focuses on the 'primary purpose' of the statement, and in particular on how it relates to a future criminal proceeding." *Id.* (citation omitted). Because Smith did not challenge the testimonial aspect of the statements in his petition for *certiorari* — but rather, "took [it] as a given that they were" testimonial — Justice Kagan concluded the issue was not "fit for [the Court's] resolution" at that time. *Id.* at 801. Indeed, Smith asserted that the state "forfeited" any assertion that the statements were not testimonial by failing to address the matter below; the state, however, denied that claim. *See id.* Thus, the Court vacated the judgment and remanded the matter to the Arizona Court of Appeals to consider whether the statements were testimonial. *See id.* at 803.

Nevertheless, Justice Kagan offered a few "thoughts" for the court on remand. *Smith*, 602 U.S. at 801. Specifically, she directed the appellate court to be exacting — that is, to determine "exactly which of [the assigned analyst's] statements [were] at issue" and what the primary purpose of those specific statements were. *Id.* at 802. Justice Kagan noted that "some records of lab analysts will not have an evidentiary purpose" and only those that have "a focus on court" should be deemed testimonial. [28] *Id.* (citation omitted).

---

[28] Justices Sotomayor, Kavanaugh, Barrett, and Jackson joined the Majority Opinion. Justices Thomas and Gorsuch joined all but part III of the Majority — the testimonial question — and both filed opinions concurring in part. Justice Thomas noted he "continue[s] to adhere to [his] view that the Confrontation Clause is implicated" only when the extrajudicial statements are in "formalized testimonial materials." *Smith*, 602 U.S. at 804 (Thomas, J., concurring in part) (citation and internal quotation marks omitted). Justice Gorsuch believed any guidance on the testimonial issue was ill-advised and questioned the Court's continued reliance on the "primary purpose" test. *Id.* at 805-807 (Gorsuch, J., concurring in part). Justice Alito filed an opinion concurring in the judgment, which Chief Justice Roberts joined. Justice Alito agreed that the substitute expert (continued…)

As noted *supra*, the Superior Court gave short shrift to Walker's constitutional Confrontation Clause challenge — concluding the reports were **not** testimonial — and, instead, determined that the rape kits reports were admissible under the Pennsylvania Rules of Evidence as an exception to the hearsay rule. It is well-established that hearsay is an out-of-court statement offered in evidence "to prove the truth of the matter asserted[.]" Pa.R.E. 801(c). While such statements are generally inadmissible, the Pennsylvania Rules of Evidence provide several exceptions to the rule against hearsay, two of which are implicated here: a statement made for medical diagnosis or treatment and a record of a regularly conducted business activity. *See* Pa.R.E. 803(4), (6).

Pursuant to Rule 803(4), an out-of-court statement is admissible if it is reasonably pertinent to "medical treatment or diagnosis in contemplation of treatment" and describes the patient's medical history or symptoms, or the general cause thereof, "insofar" as it is related to treatment or diagnosis. Pa.R.E. 803(4). *See Commonwealth v. Smith*, 681 A.2d 1288, 1291-1292 (Pa. 1996) ("[T]he declarant must make the statement **for the purpose of receiving medical treatment**" and "the statement [must] be pertinent to medical treatment.") (emphasis added and footnote omitted). Records of a regularly conducted business activity are also admissible as an exception to the hearsay rule under the strict parameters set forth in Rule 803(6), which include a record made at or near the time of an event, during the regular course of business, and testimony by a custodian or qualified witness. *See* Pa.R.E. 803(6)(A)-(E). Nevertheless, the Comment to the Rule clarifies: "If offered against a defendant in a criminal case, an entry in a record may be excluded if its admission would violate the defendant's constitutional right to confront the witnesses against him or her, *see Melendez-Diaz*[.]" Pa.R.E. 803(6), Comment.

---

"stepped over the line" when he provided his opinion that the assigned analyst complied with the laboratory's procedures and her testing was accurate. *Id.* at 819-820 (Alito, J., concurring). In his view, however, the testimony violated the Federal Rules of Evidence, not the Confrontation Clause. *See id.*

**B. Arguments of the Parties**

Walker challenges the admission of the rape kit reports on two bases — the Confrontation Clause and hearsay. First, he asserts the admission of the reports absent the testimony from the nurses who performed the sexual assault examinations violates his constitutional right to confront witnesses against him. *See* Walker's Brief at 51. Walker insists the rape kit reports are testimonial; therefore, "the supervisor with no personal knowledge of the reports at issue could [not] be a substitute surrogate witness for Confrontation Clause purposes." *Id.* at 52 (*citing Bullcoming*, 564 U.S. at 651-652). Further, he maintains the lower courts misinterpreted his objection. Walker insists he "sought to exclude **only** the rape kit part of the report prepared by the forensic nurse, with no objection to the statements made by the complainants to the nurse."[29] *Id.* at 54 (emphasis in original). However, the Superior Court improperly reviewed his objection as a challenge to the report as a whole and determined the primary purpose of the report was to provide medical care, not to prove events potentially relevant in a possible later criminal prosecution. *See id.* at 55.

Walker contends that the parts of the report recounting "[t]aking swabs from the alleged victims of sexual assaults, processing them, and preparing a report for a rape kit has nothing to do with [medical] diagnosis or treatment." Walker's Brief at 58. The only purpose of these statements by the nurse examiner, he maintains, was "to prove past events and be potentially relevant to a later prosecution[.]" *Id.* Indeed, without the nurse examiner's statement in the report that the swabs were taken from the victim, "the forensic [DNA] testing that followed … and an alleged match would be irrelevant." *Id.* at 58-59. Walker emphasizes that the Confrontation Clause applies to forensic evidence, and that

---

[29] Walker's concession on this point is specious. Since the two victims who were the subjects of the objectionable rape kit reports testified at trial, Walker clearly had the opportunity to cross-examine them regarding any statements they purportedly made to the absent nurse examiners.

only the nurse who had actually processed the swab and prepared the report should be permitted to testify about that process. *See id.* at 61. Because the nurse examiners who prepared the rape kit reports at issue here were not available to testify at trial, Walker argues that admission of the two rape kits reports violated his Confrontation Clause rights.[30]

Assuming the reports survive his constitutional challenge, Walker also maintains the rape kit reports constitute inadmissible hearsay. *See* Walker's Brief at 63-64. In his view, the reports were offered for their truth, and do not qualify under any exception to the rule against hearsay — in particular, the reports do not constitute statements made for medical diagnosis or treatment or business records. *See* Walker's Brief at 63, 65. Thus, Walker maintains the rape kit reports should not have been admitted at trial.[31]

The Commonwealth insists Walker confused the victims' medical records (*i.e.*, the rape kit reports) with the forensic DNA laboratory report. *See* Commonwealth's Brief at 26. The forensic scientist who performed the DNA comparison analysis testified at trial. However, because "the information in the medical records proffered through [the] authentication witness was not testimonial — and the nurses who recorded the medical

---

[30] Without any evidentiary basis, Walker implies that the unavailability of the nurse examiners may be the result of some misconduct. *See* Walker's Brief at 63.

[31] Walker raises an additional challenge pursuant to Pennsylvania Rule of Criminal Procedure 574. *See* Walker's Brief at 64. That rule permits the Commonwealth to offer into evidence "a forensic laboratory report supported by a certification [from the analyst] in lieu of testimony" by the analyst if the Commonwealth files and serves the defendant with written notice of its intention to do so no less than 20 days before trial. Pa.R.Crim.P. 574(a), (b)(1). Within ten days of receiving such notice, the defendant may object and file a written demand requiring the analyst to testify. *See* Pa.R.Crim.P. 574(c)(1).

Walker argues that because the Commonwealth did not follow the notice and demand provision here the trial court should have barred admission of the rape kit reports. *See* Walker's Brief at 64. We summarily reject this argument because Walker did not object to the admission of the rape kit report on this basis in the trial court. Thus, he waived any potential claim.

information conducted no tests or analysis —" the Commonwealth argues "no Confrontation Clause violation occurred." *Id.* The Commonwealth maintains that the line of cases Walker relies upon — *Smith*, *Bullcoming*, and *Brown* — concern "whether … the person who scientifically examines and analyzes evidence and prepares a report based upon its findings must generally testify and be subject to cross[-]examination before that report is introduced." *Id.* at 27. Here, conversely, the subject nurse examiners simply recorded "what happened during the medical examination[.]"[32] *Id.* at 28.

As for Walker's hearsay challenge, the Commonwealth argues the rape kit reports were admissible under either the medical treatment or regularly conducted business records exceptions in Rule 803. *See* Pa.R.E. 803(4), (6). It emphasizes that Denman's testimony was limited to the general medical information contained in the report — the parties were not permitted to ask her about any responses the victims provided regarding their attacker — as well as "how such reports are prepared and the methodology of the chain of custody." Commonwealth's Brief at 32. Moreover, the Commonwealth notes that the victims, themselves, "testified to the examination they underwent when they arrived at the hospital." *Id.* at 33.

### C. Discussion

We begin with Walker's Confrontation Clause challenge, as we conclude it is dispositive. A challenge to the admission of evidence based upon a violation of a defendant's Confrontation Clause rights presents a question of law, "for which our

---

[32] In its amicus brief, the OAG insists the trial court properly found the primary purpose of the "nurses' reports was to render medical assistance to sexual assault victims." Amicus Brief at 22. It maintains that "even if evidence preservation was a **collateral** purpose, the primary purpose of the nurses' reports … was clearly not 'creating evidence for the purpose of … prosecution.'" *Id.* at 23 (emphasis added) (*citing Ohio v. Clark*, 576 U.S. 237, 246 (2015)). Nevertheless, the OAG asserts that any error in admitting the rape kit reports was harmless since Walker did not contest his identity as the source of the DNA recovered from the victims; indeed, his defense was consent. *See id.*

standard of review is *de novo* and our scope of review is plenary." *Brown*, 185 A.3d at 324 (citation omitted).

Justice Kagan's two-part test in *Smith* requires that we first examine whether the out of court statements — the rape kit reports — were offered into evidence for their truth.[33] *See Smith*, 602 U.S. at 792. The only logical conclusion is that they were. The reports detailed the victims' descriptions of the assaults and their post-assault behaviors, as well as the nurse examiners' own observations concerning the victims' demeanor and injuries. Importantly, the reports also listed the "Evidence Collected," which included oral, vulvar, vaginal, cervix, rectal, and perineum swabs during T.A.'s examination, and vulvar, vaginal, cervix, and perineum swabs during B.H.'s examination. *See* Sexual Assault Forensic Examination Form (victim T.A.),12/2/2014, at 12; Sexual Assault Forensic Examination Form (victim B.H.), 1/12/2015, at 12. Under the heading "chain of custody," the reports further noted that the evidence was bagged, labeled, and secured in a sealed locker room; each rape kit was also assigned a control number. *See* Sexual Assault Forensic Examination Form (victim T.A.),12/2/2014, at 13; Sexual Assault Forensic Examination Form (victim B.H.), 1/12/2015, at 13. Clearly, the purpose of these statements in the reports was to establish that the nurse examiners collected the swabs from the victims that were later used to identify their attacker's DNA. The reports were admitted for their truth.

---

[33] Amicus suggests that the Supreme Court's decision in *Smith* is "extremely circumscribed" since the Court did not determine if the reports at issue were testimonial, and Justice Kagan's "general thoughts" on that topic constitute *dicta*. *See* Amicus Brief at 23 n.1. We disagree. Justice Kagan's two-step test, discussed *infra*, is merely an amalgamation and simplification of the Court's Confrontation Clause discussions over the years. Although Justice Kagan remanded for the state appellate court to consider whether the reports were testimonial in the first instance, she clearly embraced the long standing "primary purpose" test. *Smith*, 602 U.S. at 800. Further, her general "thoughts" on the testimonial issue, while *dicta*, were joined by a majority of the Justices. *See id.* at 801-802.

Next, *Smith* directs us to consider whether the reports are testimonial. *See Smith*, 602 U.S. at 800. A statement is testimonial if its "**primary purpose** … is to establish or prove past events potentially relevant to a later criminal prosecution and … any person creating the report would reasonably believe it would be available for use at a later criminal trial." *Brown*, 185 A.3d at 418 (emphasis added). *See also Davis*, 547 U.S. at 822 (statements made during police interrogation are testimonial if the "primary purpose of the interrogation is to establish or prove past events potentially relevant to a later prosecution"); *Bullcoming*, 564 U.S. at 664 ("document created solely for an 'evidentiary purpose' … made in aid of a police investigation, ranks as testimonial"). There can be no dispute that the primary purpose of the rape kit reports is to establish past events (*i.e.*, the sexual assault examination and evidence recovered) relevant to a later potential criminal prosecution.

Indeed, formally, the report is titled, "Sexual Assault Forensic Examination Form," and colloquially, we refer to it as a rape kit report. Assuming there was a rape or sexual assault in the first place leads to the presumption that the information in the report will later be used in a criminal prosecution. It is not described as a medical examination, but rather, as a "forensic" examination. Black's Law Dictionary defines "forensic" as "[u]sed in or suitable to courts of law or public debate" and "[o]f, relating to, or involving the scientific methods used for investigating crimes." Black's Law Dictionary (12th Ed. 2024) ("FORENSIC"). There is no more direct evidence of the "primary purpose" of these reports than their title.

Furthermore, similar to the autopsy report at issue in *Brown*, the rape kit itself is a creature of statute, explicitly created to provide evidence in a sexual assault prosecution. *See* 35 P.S. § 10172.3(a) (establishing a "Statewide sexual assault evidence collection program to promote the health and safety of victims … and to facilitate the prosecution of

persons accused of sexual assault"). The Sexual Assault Testing and Evidence Collection Act, 35 P.S. §§ 10172.1-10172.7, defines a "rape kit" as a "sexual assault **evidence collection** kit," and, upon its enactment, both required the establishment of a statewide tracking system for any evidence collected and mandated health care facilities to notify law enforcement of the alleged sexual assault, so long as the victim consents. 35 P.S. §§ 10172.2, 10172.3(a), (c).

The Confrontation Clause precludes the admission of testimonial hearsay absent the opportunity to cross-examine the declarant. *See Smith*, 602 U.S. at 783. The rule applies equally to statements in forensic reports. In determining if such statements constitute testimonial hearsay, courts must consider: (1) whether the statements are offered for their truth, and if so (2) whether the "primary purpose" of the statements is "to establish or prove past events relevant to a later criminal prosecution[.]" *Id.* at 784 (citation omitted); *Brown*, 185 A.3d at 418. When both questions are answered affirmatively, the statements are inadmissible absent testimony from, or the prior opportunity to cross-examine, the declarant. Thus, because the rape kit reports at issue here were offered into evidence for their truth, and their primary purpose was to provide evidence for a (potential) later criminal prosecution, Walker was entitled to confront the nurse examiners who completed the sexual assault examinations and signed the reports.[34] As he was not provided that opportunity, the admission of the reports violated his constitutional Confrontation Clause rights.

---

[34] The Dissent insists the rape kits reports are non-testimonial because, according to Denman's testimony, their "primary purpose" is to aid "medical personnel in identifying injuries, and providing medical treatment, testing, and emergency contraception." Dissenting Opinion at 39. The fact that the report "may also be a useful tool for the prosecution in a future criminal case" is not controlling. *Id.*

However, the converse is also true. The fact that a "rape kit report" — which documents important information for a future criminal prosecution — may also be useful (continued…)

Moreover, we reject the Commonwealth's assertion that the rape kit reports were admissible under either the medical records or regularly conducted business records exceptions to the rule prohibiting hearsay. *See* Pa.R.E. 803(4), (6). Our exceptions to the hearsay rule do not circumvent the requirements of the Confrontation Clause. Accordingly, when, as here, an out of court statement constitutes testimonial hearsay — as defined by *Crawford*, *Davis*, *Melendez-Diaz*, and *Smith* — it may not be admitted at trial **unless** the defendant had the opportunity to cross-examine the declarant, regardless of whether the statement would qualify as an exception to the hearsay rule.[35]

_____

in determining the appropriate medical treatment is not controlling. The medical purpose of the **examination** does not require the completion of a rape kit **report**. As explained above, the primary purpose of **that** report is to document relevant information for a future criminal prosecution.

This Court's decision in *Commonwealth v. Weeden*, 304 A.3d 333 (Pa. 2023), is plainly distinguishable. There, we held that the ShotSpotter Summary report was nontestimonial because its primary purpose was to "aid law enforcement in responding to potentially dangerous emergency situations involving gunfire." *Id.* at 353. The report is used primarily as a tool by police to respond to a present emergency — a shooting. By the time a victim submits to a sexual assault examination, the present emergency — the sexual assault — has already been completed. While the examination is completed for medical purposes, that is, to determine any injuries and necessary treatment, the rape kit report is used primarily to document evidence for a potential criminal prosecution.

[35] Furthermore, we do not agree with the Commonwealth's assertion that one of the hearsay exceptions would apply. As for the medical records exception, while there was certainly some information in the reports which described the victims' symptoms and was "reasonably pertinent to treatment or diagnosis in contemplation of treatment[,]" the Commonwealth did not seek to admit **only** the medical information. Pa.R.E. 803(4). Rather, it sought to introduce both rape kit reports *in toto* as "medical records." N.T., 10/27/2021, at 13. However, as we determined *supra*, the primary purpose of a rape kit report — and in particular, the evidence collection information in the report — is to provide evidence for a later prosecution. As Justice Kagan, joined by four other Justices, commented in *Smith*, courts must look at the specific statements at issue, rather than the report or record as a whole, to determine the primary purpose of the statements. *See Smith*, 602 U.S. at 802. Absent significant redaction of the sections of the reports discussing the evidence collection and preservation process, the reports were inadmissible under the medical records exception.

(continued…)

We also note that the testimony of PSARC's nurse manager and clinical director, Denman, was not an acceptable substitute for the testimony of the sexual assault nurse examiners. Her testimony was similar to that of the surrogate analyst in *Bullcoming* and the substitute expert in *Smith*. Based on her personal knowledge and experience, Denman could have explained how sexual assault examinations are conducted, how rape kit reports are produced, and the routine procedure by which evidence collected from the examinations is preserved and maintained.[36] *See Smith*, 602 U.S. at 799. What she could not do was become the nurse examiners' "mouthpiece" and essentially read from the rape kit reports. *Id.* at 800. However, that is exactly what Denman did at trial. *See* N.T., 10/28/2021, at 120-126, 129-137.

Because we conclude the rape kit reports constituted testimonial hearsay, the admission of the reports, absent testimony from the sexual assault nurse examiners who

---

The rape kit reports are also inadmissible as business records for the same reason — they are created primarily to provide evidence for a later criminal prosecution. As the Supreme Court explained: "Business … records are generally admissible absent confrontation not because they qualify under the exception to the hearsay rules, but because — having been created for the administration of the entity's affairs and not for the purpose of establishing some fact at trial — they are **not testimonial**." *Melendez-Diaz*, 557 U.S. at 324 (emphasis added).

[36] To allay any concerns regarding chain of custody testimony absent the introduction of the rape kit reports, we reiterate the Supreme Court's observations in *Melendez-Diaz*:

> [W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While [it] is correct that [the prosecution has] the obligation … to establish the chain of custody, this does not mean that everyone who laid hands on the evidence must be called. [Rather,] gaps in the chain [of custody] normally **go to the weight of the evidence** rather than its admissibility. It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live. …

*Melendez-Diaz*, 557 U.S. at 311 n.1 (internal citations and quotation marks omitted; emphasis added).

prepared the reports, violated Walker's constitutional right to confront witnesses against him.[37]


## V. CONCLUSION

Walker is entitled to relief on both issues raised on appeal. First, the trial court erred when it granted the Commonwealth's motion to consolidate Walker's three rape cases for trial pursuant to the common plan, scheme, or design exception to the admission of other bad acts testimony. Second, the court erred when it admitted the two rape kit reports into evidence absent testimony from the sexual assault nurse examiners who authored the reports. Accordingly, we vacate the judgment of sentence, and remand for further proceedings. Jurisdiction is relinquished.

Justices Donohue and Wecht join the opinion.

Justice Dougherty files a concurring and dissenting opinion and joins Parts I, II, III(A)-(B), and III(C)(iv) of the opinion, except footnote 19, and joins Part III(C)(i) to the extent it abrogates the logical connection test.

Chief Justice Todd files a dissenting opinion in which Justices Mundy and Brobson join.

---

[37] In his Concurring and Dissenting Opinion, Justice Dougherty insists we should not address this constitutional claim because the Commonwealth may "play[] it safe" on remand and present the testimony of the forensic nurses who completed the rape kit reports. Concurring and Dissenting Opinion at 19. Thus, he suggests our resolution of this issue of constitutional magnitude is neither "necessary to the outcome of this appeal nor certain to recur upon remand." *Id.* (citations omitted). We disagree. This issue will **most certainly** arise during Walker's retrials. The only reason the Commonwealth would "play[] it safe" in the future trials is because we have held that the rape kit reports are inadmissible under the Confrontation Clause unless the authoring sexual assault nurse examiners testify.

Moreover, to the extent Justice Dougherty insinuates that we improperly viewed the "rape kit reports in their entirety[,"] as opposed to focusing on the individual statements at issue, we reiterate that it was **the Commonwealth** that sought to admit the rape kit reports in toto as "medical records." *Supra* at 56 n.35.